[Crim. No. 7788.   In Bank.   Aug. 24, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. JACK WOODY et al., Defendants and Appellants.

Rufus W. Johnson for Defendants and Appellants.

Mitchel J. Ezer, A. L. Wirin and Fred Okrand as Amici Curiae on behalf of Defendants and Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack K. Weber, Deputy Attorney General, for Plaintiff and Respondent.

TOBRINER, J.—On April 28, 1962, a group of Navajos met in an Indian hogan in the desert near Needles, California, to perform a religious ceremony which included the use of peyote. Police officers, who had observed part of the ceremony, arrested defendants, who were among the Indians present. Defendants were later convicted of violating section 11500 of the Health and Safety Code, which prohibits the unauthorized possession of peyote. We have concluded that since the defendants used the peyote in a bona fide pursuit of a religious faith, and since the practice does not frustrate a compelling interest of the state, the application of the statute improperly defeated the immunity of the First Amendment of the Constitution of the United States.

When the police entered the hogan and charged the participants with the use of peyote, one of the Indians handed the officers a gold-colored portrait frame containing a photostatic copy of the articles of incorporation of the Native American Church of the State of California. The articles declared: ''That we as a people place explicit faith and hope and belief in the Almighty God and declare full, competent, and everlasting faith in our Church things which and by which we worship God. That we further pledge ourselves to work for unity with the sacramental use of peyote and its religious use.''

The state stipulated at trial that at the time of the arrest defendants and the other Indians were performing a religious ceremony which involved the use of peyote. Defendants pleaded not guilty to the crime of illegal possession of narcotics, contending that their possession of peyote was incident to the observance of their faith and that the state could not constitutionally invoke the statute against them without abridging their right to the free exercise of their religion. The trial proceeded without a jury; the court held defendants guilty and imposed suspended sentences.

Defendants' defense, if any, must lie in their constitutional objection. ■ We do not doubt that even though technically peyote is an ''hallucinogen'' rather than a narcotic, the state, pursuant to the police power, may proscribe its

use. (*Reetz* v. *Michigan* (1903) 188 U.S. 505 [23 S.Ct. 390, 47 L.Ed. 563]; *Sandelin* v. *Collins* (1934) 1 Cal.2d 147 [33 P.2d 1009, 93 A.L.R. 956].) Only if the application of the proscription improperly infringes upon the immunity of the First Amendment can defendants prevail; their case rests upon that amendment, which is operative upon the states by means of the Fourteenth Amendment (*Cantwell* v. *Connecticut* (1940) 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352]). The First Amendment reads "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."[1]

■ Although the prohibition against infringement of religious belief is absolute, the immunity afforded religious practices by the First Amendment is not so rigid. (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 403 [83 S.Ct. 1790, 10 L.Ed.2d 965]; *In re Jenison* (1963) 375 U.S. 14 [84 S.Ct. 63, 11 L.Ed. 2d 39]; *West Virginia State Board of Education* v. *Barnette* (1942) 319 U.S. 624 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674]; *Braunfeld* v. *Brown* (1960) 366 U.S. 599 [81 S.Ct. 1144, 6 L.Ed.2d 563]; *Cantwell* v. *Connecticut, supra,* 310 U.S. 296; *Reynolds* v. *United States* (1878) 98 U.S. 145 [25 L.Ed. 244].) But the state may abridge religious practices only upon a demonstration that some compelling state interest outweighs the defendants' interests in religious freedom. (*Sherbert* v. *Verner, supra,* 374 U.S. 398, 406; *In re Jenison, supra,* 375 U.S. 14; *Braunfeld* v. *Brown, supra,* 366 U.S. 599, 613-614; *Cantwell* v. *Connecticut, supra,* 310 U.S. 296, 311; *West Virginia State Board of Education* v. *Barnette, supra,* 319 U.S. 624, 643-644.)

The Supreme Court of the United States recently in *Sherbert* v. *Verner, supra,* restated the rule. In *Sherbert* a South Carolina employer discharged appellant, a Seventh-day Adventist, because she refused to work on Saturdays. Since her "conscientious scruples" against Saturday work precluded her from obtaining other employment, appellant applied for unemployment compensation benefits. The South Carolina Employment Security Commission rejected appellant's claim

---

[1]Defendants also rely upon Cal. Const., art. I, section 4, which provides: "The free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever be guaranteed in this State; and no person shall be rendered incompetent to be a witness or juror on account of his opinions on matters of religious belief; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of this State."

upon the ground that she had ". . . . failed, without good cause . . . to accept available suitable work. . . ." The South Carolina courts affirmed the commission's ruling despite appellant's contention that application of the disqualifying provision of the statute abridged her right to the free exercise of her religion

The United States Supreme Court reversed, finding, first, that the denial of compensation benefits clearly constituted a burden upon the free exercise of appellant's religion. The court then stated that it must ". . . consider whether some compelling state interest enforced in the eligibility provisions of the South Carolina statute justifies the substantial infringement of appellant's First Amendment right. It is basic that no showing merely of a rational relationship to some colorable state interest would suffice; in this highly sensitive constitutional area, '[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation. [Citation.]' " (P. 406.)

Despite the plea by South Carolina that fraudulent religious objections to Saturday work would dilute the state compensation fund and interfere with employers' scheduling of necessary Saturday work, the court held that "no such abuse or danger has been advanced in the present case" which would justify the abridgement of appellant's religious freedom.

The court in *Sherbert* thus utilized a twofold analysis which calls for a determination of, first, whether the application of the statute imposes any burden upon the free exercise of the defendant's religion, and second, if it does, whether some compelling state interest justifies the infringement.[2]

The first step requires an exploration into the particulars of this case to determine whether section 11500 of

---

[2]The court's requirement of a "compelling state interest" echoes Justice Jackson's statement in *West Virginia State Board of Education* v. *Barnette, supra,* 319 U.S. 624, 639, that "The right of a State to regulate, for example, a public utility may well include . . . power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible *of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect.*" (Italics added; see also *National Assn. for Advancement of Colored People* v. *Button* (1963) 371 U.S. 415, 438 [83 S.Ct. 328, 9 L.Ed.2d 405]; *American Civil Liberties Union* v. *Board of Education* (1961) 55 Cal.2d 167, 178 [10 Cal.Rptr. 647, 359 P.2d 45, 94 A.L.R.2d 1259]; *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276, 286 [29 Cal.Rptr. 1, 379 P.2d 481].)

the Health and Safety Code imposes any burden upon the free exercise of defendants' religion. An examination of the record as to the nature of peyote and its role in the religion practiced by defendants as members of the Native American Church of California compels the conclusion that the statutory prohibition most seriously infringes upon the observance of the religion.

The plant Lophophora williamsii, a small, spineless cactus, found in the Rio Grande Valley of Texas and northern Mexico, produces peyote, which grows in small buttons on the top of the cactus. Peyote's principal constituent is mescaline. When taken internally by chewing the buttons or drinking a derivative tea, peyote produces several types of hallucinations, depending primarily upon the user. In most subjects it causes extraordinary vision marked by bright and kaleidoscopic colors, geometric patterns, or scenes involving humans or animals. In others it engenders hallucinatory symptoms similar to those produced in cases of schizophrenia, dementia praecox, or paranoia. Beyond its hallucinatory effect, peyote renders for most users a heightened sense of comprehension; it fosters a feeling of friendliness toward other persons.

Peyote, as we shall see, plays a central role in the ceremony and practice of the Native American Church, a religious organization of Indians. Although the church claims no official prerequisites to membership, no written membership rolls, and no recorded theology, estimates of its membership range from 30,000 to 250,000, the wide variance deriving from differing definitions of a "member." As the anthropologists have ascertained through conversations with members, the theology of the church combines certain Christian teachings with the belief that peyote embodies the Holy Spirit and that those who partake of peyote enter into direct contact with God.

Peyotism discloses a long history. A reference to the religious use of peyote in Mexico appears in Spanish historical sources as early as 1560. Peyotism spread from Mexico to the United States and Canada; American anthropologists describe it as well established in this country during the latter part of the nineteenth century. Today, Indians of many tribes practice Peyotism. Despite the absence of recorded dogma, the several tribes follow surprisingly similar ritual and theology; the practices of Navajo members in Arizona practically parallel those of adherents in California, Montana, Oklahoma, Wisconsin, and Saskatchewan.

The "meeting," a ceremony marked by the sacramental use of peyote, composes the cornerstone of the peyote religion.

The meeting convenes in an enclosure and continues from sundown Saturday to sunrise Sunday. To give thanks for the past good fortune or find guidance for future conduct, a member will "sponsor" a meeting and supply to those who attend both the peyote and the next morning's breakfast. The "sponsor," usually but not always the "leader," takes charge of the meeting; he decides the order of events and the amount of peyote to be consumed. Although the individual leader exercises an absolute control of the meeting, anthropologists report a striking uniformity of its ritual.

A meeting connotes a solemn and special occasion. Whole families attend together, although children and young women participate only by their presence. Adherents don their finest clothing, usually suits for men and fancy dresses for the women, but sometimes ceremonial Indian costumes. At the meeting the members pray, sing, and make ritual use of drum, fan, eagle bone, whistle, rattle and prayer cigarette, the symbolic emblems of their faith. The central event, of course, consists of the use of peyote in quantities sufficient to produce an hallucinatory state.

At an early but fixed stage in the ritual the members pass around a ceremonial bag of peyote buttons. Each adult may take four, the customary number, or take none. The participants chew the buttons, usually with some difficulty because of extreme bitterness; later, at a set time in the ceremony any member may ask for more peyote; occasionally a member may take as many as four more buttons. At sunrise on Sunday the ritual ends; after a brief outdoor prayer, the host and his family serve breakfast. Then the members depart. By morning the effects of the peyote disappear; the users suffer no aftereffects.

Although peyote serves as a sacramental symbol similar to bread and wine in certain Christian churches, it is more than a sacrament. Peyote constitutes in itself an object of worship; prayers are directed to it much as prayers are devoted to the Holy Ghost. On the other hand, to use peyote for nonreligious purposes is sacrilegious. Members of the church regard peyote also as a "teacher" because it induces a feeling of brotherhood with other members; indeed, it enables the participant to experience the Deity. Finally, devotees treat peyote as a "protector." Much as a Catholic carries his medallion, an Indian G.I. often wears around his neck a beautifully beaded pouch containing one large peyote button.[3]

---

[3]Although Peyotism has not assumed a major role in American Indian life, it has in some respects affected it. On the one hand, no extant

The record thus establishes that the application of the statutory prohibition of the use of peyote results in a virtual inhibition of the practice of defendants' religion. To forbid the use of peyote is to remove the theological heart of Peyotism. Having reached this conclusion, we must undertake the second step in the analysis of the constitutional issue: a determination of whether the state has demonstrated that "compelling state interest" which necessitates an abridgement of defendants' First Amendment right. (*Sherbert* v. *Verner, supra,* 374 U.S. 398, 406; see *West Virginia State Board of Education* v. *Barnette, supra,* 319 U.S. 624, 643-644; *National Assn. for Advancement of Colored People* v. *Button, supra,* 371 U.S. 415, 438; *American Civil Liberties Union* v. *Board of Education, supra,* 55 Cal.2d 167, 178.)

The state asserts that the compelling reason for the prohibition of Peyotism lies in its deleterious effects upon the Indian community, and even more basically, in the infringement such practice would place upon the enforcement of the narcotic laws because of the difficulty of detecting fraudulent claims of an asserted religious use of peyote. The prosecution further claims that the cases support these positions. We set forth the reasons why we believe the contentions to be unfounded.

The People urge that "the use of peyote by Indians in place of medical care, the threat of indoctrination of small children," and the "possible correlation between the use of this drug and the possible propensity to use some other more harmful drug" justify the statutory prohibition. The record, however, does not support the state's chronicle of harmful consequences of the use of peyote.

The evidence indicates that the Indians do not in fact employ peyote in place of proper medical care; and, as the Attorney General with fair objectivity admits, "there was no evidence to suggest that Indians who use peyote are more liable to become addicted to other narcotics than non-peyote-using Indians." Nor does the record substantiate the state's fear of the "indoctrination of small children"; it shows that Indian children never, and Indian teenagers rarely, use peyote. Finally, as the Attorney General likewise admits, the opinion

Indian nation recognizes it as its national religion; the Navajo Tribal Code forbids the possession of peyote, the driving of a car while under the influence of peyote, and the sale of peyote on the reservation. On the other hand, however, most anthropological authorities hold Peyotism to be a positive, rather than negative, force in the lives of its adherents. Since the church forbids the use of alcohol and has adopted many of the moral precepts of Christianity, these authorities conclude that members observe higher standards than nonmembers.

of scientists and other experts is "that peyote . . . works no permanent deleterious injury to the Indian. . . ." Indeed, as we have noted, these experts regard the moral standards of members of the Native American Church as higher than those of Indians outside the church.

The Attorney General also argues that since "peyote could be regarded as a symbol, one that obstructs enlightenment and shackles the Indian to primitive conditions" the responsibility rests with the state to eliminate its use. We know of no doctrine that the state, in its asserted omniscience, should undertake to deny to defendants the observance of their religion in order to free them from the suppositious "shackles" of their "unenlightened" and "primitive condition."

Turning to the state's second contention, that the threat of fraudulent assertions of religious immunity will render impossible the effective enforcement of the narcotic laws, we note that South Carolina in *Sherbert* v. *Verner, supra,* unsuccessfully urged to the United States Supreme Court a substantially similar contention. It argued that "a possibility that the filing of fraudulent claims by unscrupulous claimants feigning religious objections to Saturday work might . . . dilute the unemployment compensation fund . . . [and] hinder the scheduling by employers of necessary Saturday work." (374 U.S. at p. 407.) The Supreme Court held among its alternate grounds for disposing of this contention, that "there is no proof whatever to warrant such fears of malingering or deceit as those which the respondents now advance." (*Id.* at p. 407.) Further, the court pointed out that "even if the possibility of spurious claims did threaten to dilute the fund and disrupt the scheduling of work, it would plainly be incumbent upon the [state] to demonstrate that no alternative forms of regulation would combat such abuses without infringing First Amendment rights." (*Id.* at p. 407.) In the instant case, as in *Sherbert,* the state produced no evidence that spurious claims of religious immunity would in fact preclude effective administration of the law or that other "forms of regulation" would not accomplish the state's objectives.

That other states have excepted from the narcotic laws the use of peyote, and have not considered such exemption an impairment to enforcement, weakens the prosecution's forebodings. New Mexico in 1959, and Montana in 1957, amended their narcotics laws to provide that the prohibition against narcotics "shall not apply to the possession, sale or gift of peyote for religious sacramental purposes by any bona fide

religious organization incorporated under the laws of the state.''[4]  Arizona has reached a similar result by judicial decree.[5]

That the state's showing of ''compelling interest'' cannot lie in untested assertions that recognition of the religious immunity will interfere with the enforcement of the state statute, finds illustrated in the Minnesota litigation culminating in *In re Jenison* (1963) 267 Minn. 136 [125 N.W. 2d 588]. In the original *Jenison* case, the Minnesota Supreme Court, prior to the decision in *Sherbert* v. *Verner,* affirmed the criminal contempt conviction of a woman who refused to serve on a jury because of religious objections. (*In re Jenison* (1963) 265 Minn. 96 [120 N.W.2d 515].)  The United States Supreme Court reversed *per curiam* and remanded the case to the Minnesota Supreme Court ''for further consideration in light of *Sherbert* v. *Verner.* . . .''  (*In re Jenison* (1963) 375 U.S. 14 [84 S.Ct. 63, 11 L.Ed.2d 39].) Upon remand the state court reversed the conviction, stating that ''there has been an inadequate showing that the state's interest in obtaining competent jurors requires us to override relator's right to the free exercise of her religion.  Consequently we hold that until and unless further experience indicates that the indiscriminate invoking of the First Amendment poses a serious threat to the effective functioning of our jury system, any person whose religious convictions prohibit compulsory jury duty shall henceforth be exempt.''  (*Id.* at p. 589.)

We turn to the several cases cited by the Attorney General which uphold statutes restricting religious practices.   The People principally rely upon *Reynolds* v. *United States* (1878) 98 U.S. 145 [25 L.Ed. 244], which ruled that Congress could constitutionally apply to Mormons a prohibition against polygamy. The Mormon doctrine of polygamy rested in alleged divine origin and imposed upon male members, circumstances permitting, the observance of the practice upon pain of eternal damnation.

The Supreme Court held that the history of the laws against polygamy showed that the condemnation of the practice was a matter of the gravest social importance.  It found in polyg-

---

[4]New Mexico Statutes (1959) 54-5-16; Montana Statutes (1959) 94-35-23.

[5]In *Arizona* v. *Attakai,* Criminal No. 4098, Coconino County, July 26, 1960; appeal by State dismissed by Arizona Supreme Court. The Arizona court held that its narcotics statute could not constitutionally be applied to members of the Native American Church.

amy the seed of destruction of a democratic society.[6] Viewing the practice as highly injurious to its female adherents, the court classed polygamy with such religious rites as sacrifice of human beings and funereal immolation of widows.

*Reynolds* v. *United States* must be distinguished from the instant case for two fundamental reasons. The test of constitutionality calls for an examination of the degree of abridgment of religious freedom involved in each case. Polygamy, although a basic tenet in the theology of Mormonism, is not essential to the practice of the religion; peyote, on the other hand, is the *sine qua non* of defendants' faith. It is the sole means by which defendants are able to experience their religion; without peyote defendants cannot practice their faith. Second, the degree of danger to state interests in *Reynolds* far exceeded that in the instant case. The court in *Reynolds* considered polygamy as a serious threat to democratic institutions and injurious to the morals and well-being of its practitioners. As we have heretofore indicated, no such compelling state interest supports the prohibition of the use of peyote.

Similarly, *Braunfeld* v. *Brown* (1960) 366 U.S. 599 [81 S.Ct. 1144, 6 L.Ed.2d 563] cited by the People, upholding the Pennsylvania Sunday Law against a free exercise objection by Sabbatarians, differs from the present case. *Braunfeld* represents only an "incidental"[7] infringement of religious freedom contrasted with "a strong state interest in providing one uniform day of rest for all workers. That secular objective could be achieved . . . only by declaring Sunday to be that day of rest. Requiring exemptions for Sabbatarians,

[6]The court declares: "Upon [marriage] society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal. In fact, according as monogamous or polygamous marriages are allowed, do we find the principles on which the government of the people, to a greater or less extent, rests. Professor Lieber says, polygamy leads to the patriarchal principle, and which, when applied to large communities, fetters the people in stationary despotism, while that principle cannot long exist in connection with monogamy. . . ." (*Id.* at pp. 165-166.)

[7]The court stated: ". . . the statute at bar does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity and, as applied to appellants, operates so as to make the practice of their religious beliefs more expensive. Furthermore, the law's effect does not inconvenience all members of the Orthodox Jewish faith but only those who believe it necessary to work on Sunday. *And even these are not faced with as serious a choice as forsaking their religious practices or subjecting themselves to criminal prosecution.*" (*Id.* at p. 605; italics added.)

while theoretically possible, appeared to present an administrative problem of such magnitude . . . that such a requirement would have rendered the entire statutory scheme unworkable.'' (*Sherbert* v. *Verner* (1963) 374 U.S. 398, 408, 409 [83 S.Ct. 1790, 10 L.Ed.2d 965].)[8]

■ Finally, we deal with the Attorney General's argument that our present conclusion requires an inquiry in each case into the bona fides of a particular defendant's beliefs, an inquiry which is both difficult and ''repugnant to the spirit of our law. . . .'' Yet the trier of fact need inquire only into the question of whether the defendant's belief in Peyotism is honest and in good faith. As the court in *United States* v. *Ballard* (1944) 322 U.S. 78 [64 S.Ct. 882, 88 L.Ed. 1148], held, although judicial examination of the truth or validity of religious beliefs is foreclosed by the First Amendment, the courts of necessity must ask whether. the claimant holds his belief honestly and in good faith or whether he seeks to wear the mantle of religious immunity merely as a cloak for illegal activities.

In so doing, we impose no undue burden upon the trier of fact. We do not doubt the capacity of judge and jury to distinguish between those who would feign faith in an esoteric religion and those who would honestly follow it. ''Suffice it to say that trial courts will have to determine in each instance, with whatever evidence is at hand, whether or not the assertion of a belief which is protected by the First Amendment is *in fact* a spurious claim.'' (*In re Jenison, supra,* 125 N.W.2d 588, 590; italics added.) Thus the court makes a factual examination of the bona fides of the belief and does not intrude into the religious issue at all; it does not determine the nature of the belief but the nature of defendants' adherence to it.

Courts reach such factual determinations in a host of related circumstances. Thus the Universal Military Training and Service Act (1948) 50 U.S.C.App., section 456(j), exempts from combat training and service any person ''who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form.'' (See, e.g., *Rempel* v. *United States* (10th Cir. 1955) 220 F.2d 949, 951;

---

[8]Such cases as *Prince* v. *Massachusetts* (1943) 321 U.S. 158 [64 S.Ct. 438, 88 L.Ed. 645] [child labor law applied to guardian of a 9-year-old Jehovah's Witness]; *Jacobson* v. *Massachusetts* (1904) 197 U.S. 11 [25 S.Ct. 358, 49 L.Ed. 643] [compulsory vaccination law]; and *In re Ferguson* (1961) 55 Cal.2d 663 [12 Cal.Rptr. 753, 361 P.2d 417] [lawful incarceration restricting religious observances] must be distinguished from the present case upon similar grounds.

*United States* v. *Hagaman* (3rd Cir. 1954) 213 F.2d 86, 89; *In re Jost* (1953) 117 Cal.App.2d 379, 387 [256 P.2d 71], revd. 347 U.S. 901 [74 S.Ct. 427, 98 L.Ed. 1061] [applying conscientious objector provision in Internal Security Act of 1950, 8 U.S.C.Supp. IV, § 735].) Significantly, title II, section 3, of the National Prohibition Act (1919) 41 Stat. 308-309, exempted from prohibition the use of wine for sacramental purposes.

In the instant case, of course, we encounter no problem as to the bona fide nature of defendants' assertion of the free exercise clause. The state agrees, and the evidence amply demonstrates, that defendants' use of peyote was for a religious purpose.[9]

We have weighed the competing values represented in this case on the symbolic scale of constitutionality. On the one side we have placed the weight of freedom of religion as protected by the First Amendment; on the other, the weight of the state's ''compelling interest.'' Since the use of peyote incorporates the essence of the religious expression, the first weight is heavy. Yet the use of peyote presents only slight danger to the state and to the enforcement of its laws; the second weight is relatively light. The scale tips in favor of the constitutional protection.

We know that some will urge that it is more important to subserve the rigorous enforcement of the narcotic laws than to carve out of them an exception for a few believers in a strange faith. They will say that the exception may produce problems of enforcement and that the dictate of the state must overcome the beliefs of a minority of Indians. But the problems of enforcement here do not inherently differ from those of other situations which call for the detection of fraud. On the other hand, the right to free religious expression embodies a precious heritage of our history. In a mass society, which presses at every point toward conformity, the protection of a self-expression, however unique, of the individual and the group becomes ever more important. The varying currents of the subcultures that flow into the mainstream of our national life give it depth and beauty. We preserve a greater value than an ancient tradition when we protect the rights of the Indians who honestly practiced an old religion

---

[9]We note that our determination that defendants are entitled to religious exemption raises no issue under the establishment clause of the First Amendment. (*Sherbert* v. *Verner, supra,* 374 U.S. at p. 409.)

in using peyote one night at a meeting in a desert hogan near Needles, California.

The judgment is reversed.

Gibson, C. J., Traynor, J., Schauer, J., Peters, J., and Peek, J., concurred.

McComb, J., dissented.