114 N.J. Super. 63 (1971)
274 A.2d 832
LARANCE VALENT AND JOAN VALENT, GUARDIAN AND NATURAL PARENTS OF ANTHONY VALENT, AMY VALENT, AND COLEEN VALENT, PLAINTIFFS,
v.
THE NEW JERSEY STATE BOARD OF EDUCATION, NEW JERSEY STATE DEPARTMENT OF EDUCATION, ET ALS., MORRIS COUNTY SUPERINTENDENT OF SCHOOLS, ET ALS., AND PARSIPPANY-TROY HILLS BOARD OF EDUCATION MEMBERS, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided February 8, 1971.
Supplemented in writing March 2, 1971.
*65 Mr. Salvatore Simeone for plaintiffs (Mr. Frank A. Paglianite, attorney).
Mrs. Virginia Long Annich for defendants N.J. State Board of Education, N.J. Department of Education, Carl Marburger, Commissioner of Education, Members of the State Board of Education and Leslie V. Rear, Morris County Superintendent of Schools (Mr. George F. Kugler, Jr., Attorney General of New Jersey, attorney).
Mr. Alten W. Read, for defendants Parsippany-Troy Hills Board of Education, George Oldham, Superintendent, John Sheehy, Assistant Superintendent, and the individual members of the Parsippany-Troy Hills Board of Education (Messrs. Schenck, Price, Smith & King, attorneys).
Decided February 8, 1971. (orally from the bench)
STAMLER, J.S.C.
The complaint in the case at bar was originally filed in the Law Division and upon motion of defendants was ordered transferred to the Chancery Division.
This matter is now before the court on the motions of the Attorney General as attorney for the New Jersey State Board of Education, the New Jersey Department of Education, *66 Carl Marburger, Commissioner of Education, the members of the State Board of Education and Leslie V. Rear, county superintendent of schools, joined in by the attorneys for defendants Parsippany Troy Hills Board of Education, the superintendent of schools, the assistant superintendent of schools, and the individual members of the Parsippany-Troy Hills Board of Education.
The motions are two-fold attacks upon plaintiffs' verified complaint. The first seeks a dismissal of the complaint on the ground that it fails to state a claim upon which relief can be granted in this court. The second is for summary judgment. At the conclusion of arguments the court rendered an oral opinion. This opinion is in supplementation thereof.
Generally, plaintiffs allege that a course entitled "Human Sexuality" given in the Parsippany-Troy Hills public schools requiring the attendance of their children violates the First, Ninth, Tenth and Fourteenth Amendments of the United States Constitution and Art. I, pars. 3 and 4 of the New Jersey Constitution.
Collating the allegations of the verified complaint in each of its seven counts with the answers, there is but one area in which denials are found. For the most part the Attorney General expresses neither admission nor denial, asserting lack of knowledge, leaving plaintiffs to their proof. The local board, in answering many vital paragraphs of the complaint, neither admits nor denies. The local board does deny that the questioned course includes teachings and discussions of sexual intercourse, masturbation and contraception, contrary to religious beliefs of plaintiffs; that the course is critical of parental authority; that a defacto religion is created.
The thrust of the first motion made by both State Board and local board is that plaintiffs have failed to exhaust their administrative remedies, for the Legislature of New Jersey has given a quasi-judicial power to the State Board of Education to determine school disputes. Defendants assert that *67 the issues raised by the complaint are school disputes. It is the position of defendants that since no formal application has been made for State Board adjudication in approval or disapproval of the local board's action, plaintiffs are left to their exclusive remedy under the statutes of New Jersey (N.J.S.A. 18A:6-9) to contest administratively what the local board is doing before the Commissioner of Education and if an adverse ruling results, appeal to the State Board. Thereafter, an appeal pursuant to rule of court may be taken directly to the Appellate Division as an appeal from an administrative determination R. 2:2-3 (a) (2).
Plaintiffs are Larance Valent and Joan Valent, guardian and natural parents of Anthony, Amy and Coleen Valent. The children attended the Parsippany-Troy Hills public schools. Plaintiffs are members of the Catholic faith.
On January 4, 1967 the New Jersey State Board of Education issued a policy statement recommending that appropriate programs of sex education be developed by educational institutions in this State. On July 2, 1969 the Legislature of the State of New Jersey in an Assembly Concurrent Resolution noted that public controversy had arisen in the area of sex education and requested the Commissioner of Education to direct all boards of education that no new sex education program should be instituted pending the outcome of a legislative inquiry.
On July 25, 1969, pursuant to that resolution, the Commissioner of Education with the approval of the State Board of Education advised all school boards to postpone consideration of new sex education programs. Notwithstanding the Assembly Concurrent Resolution and the Commissioner's memorandum of advice to the local boards, defendant Parsippany-Troy Hills Board of Education instituted a program in "Human Sexuality" in its school district. It is this program which is the subject of the complaint.
On April 9, 1970 the Senate and the Assembly Committees on Education made a joint report to the Legislature concerning and endorsing with recommended limitations sex *68 education in the public schools. On July 27, 1970 the State Board of Education by memorandum of the Commissioner of Education advised all superintendents, county superintendents and all local boards of education that the moratorium on the institution of programs of sex education pending the conclusion of the legislative inquiry was rescinded. The State Board concurred in some of the limiting recommendations of the Legislature, but rejected others. It is in this latter area that the controversies here arise. In his memorandum of July 27, 1970 the Commisisoner of Education conveyed the views and directives of the State Board of Education. The first sentence is an expression of that agency:
The State Board of Education has received the report to the Legislature by the Senate and Assembly Committees on education concerning sex education in the public schools and wishes to acknowledge to the Joint Committee its appreciation for that body's fair, impartial and comprehensive study of problems and issues relating to sex education.
The third paragraph of the Commissioner's memorandum states:
The third recommendation [of the Legislature] to which the State Board takes specific exception is that local boards of education permit students to take sex education courses unless a parent or guardian files written objection with the Board of Education. [Emphasis in text]
The Commissioner went on to say:
It is the belief of the State Board that local boards of education should not be required to grant such exceptions. To do otherwise would be to establish a precedent which could have far-reaching impact on the efficacy of the public school system. Such a precedent could open the door for demands for exclusion, on grounds of conscience, from such courses as health and physical education, biology, history and even English literature. This belief of the State Board does not alter the accepted principle that local boards of education have a right either to establish sex education courses or to refrain *69 from approving any sex education in the schools under their control. [Emphasis supplied].
The Commissioner further advised local boards:
Another recommendation of the Joint Committee that local boards of education not adopt any formal course of study on sex education for grades below the junior high school level requires clarification. The State Board agrees that the study of sex education in an informal course structure is appropriate for the elementary grades. However, it does not believe that school districts should be limited in their choice to an informal curriculum nor does the State Board believe that such studies should necessarily be restricted to Biology, Health, Zoology and other science courses. [Emphasis supplied].
The letter concludes, "local districts are now advised that the moratorium, which I referred to heretofore, is rescinded as of this date."
Defendants urge that this court has no jurisdiction to determine the issues raised by the complaint and answers filed. The Education Act (N.J.S.A. 18A:6-9) did give to the State Board of Education a quasi-judicial function in those matters where it could exercise its expertise. This court cannot and does not intend to substitute its judgment in those matters where the State Board of Education and the Commissioner of Education have special expertise. However, in matters of substantial constitutional dimension the Executive and the Legislature are not the determining or final arbiters of what is and what is not constitutional. Since Marbury v. Madison 1 Cranch 137, 5 U.S. 137, 2 L.Ed. 60 (1803), this obligation is imposed upon the judiciary, not the executive or legislative branches.
An additional reason why this matter should be resolved in the courts rather than administratively is the discretionary power of the courts, in particular cases where the interests of justice so require, to by-pass the administrative process where either there is no special expertise or where the administrative judgment has in fact been rendered, albeit informally. Matawan v. Monmouth County Tax Board, *70 51 N.J. 291, 296 (1968); Durgin v. Brown, 37 N.J. 189, 202 (1962).
For many years our courts have been critical of various administrative procedures where the administrative board has been both judge and jury as well as prosecutor. The question raised in this case is whether the local board has, with the imprimatur of the State Board, intruded upon a matter of conscience, a matter of religion, in a fully and completely forbidden area. The State Board has expressed itself in that field.
The Commissioner and the State Board of Education have already rendered a decision with regard to matters of conscience. They have directed that no one shall be excused from a class in sex education or "Human Sexuality" (as it is entitled in Parsippany) on grounds of conscience.
To now go back to the State Board and ask it to consider an exclusion on the grounds of religion or conscience would be an exercise in futility, because the Board had all of the information including the recommendations of the Legislature. The Board considered the divergent opinions. Notwithstanding that the instructions to the local board did not require a course in human sexuality, the State Board concluded that if such a course were instituted, no one was permitted to abstain on grounds of conscience. Courts are required to protect, preserve and interpret, as they have been doing over the years, the Constitution of the United States.
The motion to dismiss for a failure to state a claim upon which relief can be granted, on the ground that there has not been an exhaustion of administrative remedies, is denied.
Attending to the motion for summary judgment, it is well settled in our State that on such motions the court is required to scrutinize the complaint, the answers and affidavits, if any, and determine whether there is a genuine issue of relevant fact. The burden is on the moving party to exclude any reasonable doubt as to the existence of a genuine issue of material fact. All inference of doubt must be drawn in favor of those who oppose the motion. United Advertising *71 Corp. v. Metuchen, 35 N.J. 193, 196 (1961). If there were no affidavits by defendants, a complaint fully verified which in part alleges an intrusion in the public schools upon religious dogma, contrary to the First Amendment to the United States Constitution, would be considered in a light most favorable to plaintiffs. Defendants have filed an affidavit by the Director of Curriculum in Human Sexuality. The Director avers that his curriculum does not offend any religious doctrine or religion. He has determined, and defendants accept his view, that there is no intrusion upon religious freedoms. The Director further states that the State Board and the elected officials on the local board, and the Junior Chamber of Commerce, by a house-to-house canvass found that sex education courses in the Parsippany-Troy Hills School system are necessary and beneficial for the students.
Counsel for the local board argues that Cornwell v. State Board of Education of Maryland, 314 F. Supp. 340 (D.C. Md. 1969), is dispositive of all issues here raised. In that case similar questions were raised on a motion by the state board of education to dismiss the complaint of parents of minors against the sex education course. Cornwell passes briefly by, and in cursory manner, what is the most important decision with regard to "free exercise". The present state of the law requires that all courts must in "free exercise" cases, use Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), as the starting point.
The First Amendment to the United States Constitution reads:
Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof.
No constitutional provision has caused greater turmoil, litigation and divisiveness throughout the country than this one brief sentence. The United States Supreme Court has recognized that this short sentence is incongruous.
*72 Defendants rely heavily on Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (school bussing); Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962) (school prayer); Chamberlin v. Dade County Board of Public Instruction, 374 U.S. 487, 83 S.Ct. 1864, 10 L.Ed. 2d 1043 (1963), rehearing 377 U.S. 402, 84 S.Ct. 1272, 12 L.Ed.2d 407 (1964) (devotional Bible reading); Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed. 2d 1060 (1968) (loan of text books to parochial school students); Zorach v. Clauson, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (released-time program). However, these cases are all "establishment clause" cases. The present case is predominantly one of "free exercise."
Where the "establishment clause" confronts the "free exercise clause," the founding fathers who drew this constitutional provision intended that the "free exercise clause" be dominant. This is readily understandable.
Plaintiffs here allege that if they do not send their children to school they will be subject to criminal prosecution. (This is no longer in the case since they are being tutored at home with the understanding that pending a determination herein no prosecution will be pressed, but there has been no excusal as a matter of conscience.) But of greater importance is the fact that the children are compelled to attend instruction violating a religious dogma or be educated at additional expense in a sectarian school.
The first limitation on the "free exercise clause"  as opposed to the "establishment clause"  by the United States Supreme Court came in Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878). There it was held that although government by its laws cannot interfere with religious beliefs and opinions, it may with religious practices. Reynolds was the historically significant polygamy case. From the language in that case "beliefs" and "opinions," as opposed to "practices", were recognized as the core value to be protected and which permitted of no exception.
*73 In later years, in later cases, it had been held that this clause protects "religious practices" as well as the right to worship through quiet belief and opinion. The right to engage in a particular act or acts essential in the exercise of one's religious freedom was always carefully guarded by the courts. The only exception occurred when the specific ritual in religious practice endangered the health or safety of others.
We come through the years from 1878 to Sherbert, supra, in 1963. A startling instruction by the United States Supreme Court for trial court conduct in "free exercise" cases appears between the lines. Mrs. Sherbert, a Seventh Day Adventist, was denied unemployment compensation because of her unwillingness to accept employment which required her to work on Saturday, a religious day. Mr. Justice Brennan, speaking for the Supreme Court, stated:
It is basic that no showing merely of a rational relationship to some colorable state interest would suffice [to justify the denial]; in this highly sensitive constitutional area, [o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." (374 U.S. at p. 406, 83 S.Ct. at p. 1795)
Because the state had failed to carry its burden of showing clearly that an essential state interest would be jeopardized by noncompliance, Mrs. Sherbert prevailed. To put it another way, the impact of the questioned regulation upon her amounted to the loss of her living allowance, and the interest of the state was not particularly endangered. Additionally, an unquestioned, sincere religious belief was protected.
This, then was the prime step by the United States Supreme Court charging lower courts with the obligation to examine and balance harm, if any, to an individual's freedom of conscience, on the one hand, against damage, if any, to the essential governmental regulatory or legislative purpose. Unfortunately, no guidelines to assist a trial court were established by the Supreme Court in Sherbert. It would have *74 been extremely helpful to this court had some standards been designed.
In People v. Woody, 61 Cal.2d 716, 40 Cal. Rptr. 69, 394 P.2d 813 (1964), the court held that the state could not constitutionally apply the statute prohibiting the use of peyote so as to prevent an Indian tribe from using the forbidden drug as sacramental symbols similar to the bread and wine used in Christian churches. The trial court took the proofs of the necessity for a broad statute prohibiting the general sale and use of narcotics and was satisfied that for many, many years the Native American Church of the State of California had as its doctrine the use of peyote in sacramental ritual. The state was unable to show to the satisfaction of the trial court or the high court that to permit these Indians to use peyote in their religious services would harm the state's program against narcotic users. The important part of that case, as far as this court is concerned, is that the state presented evidence as to the substantial necessity for the prohibition, and the defendants were permitted to show that no harm would come to the state by way of that practice. The trial of facts in Woody was deemed essential under the ruling in Sherbert.
It would be absurd for this court to say that a state regulation which prohibited the sacramental use of wine in the rites of a specific church would be constitutional during Prohibition days. The sacramental use of wine was permitted because of minimal harmful effects to the state.
The infant plaintiffs, speaking through their parents, state that they are sincere in their beliefs; that the program in "Human Sexuality" is derogatory of the beliefs that their religion requires them to entertain.
State v. Perricone, 37 N.J. 463 (1962), clearly exhibits that the trial court and our Supreme Court anticipated the Sherbert requirements of balancing. In Perricone the parents refused to grant permission for a blood transfusion for their infant son. The refusal was based upon their affiliation with and membership in Jehovah's Witnesses, whose *75 dogma forbids the taking of blood or transferring it from one person to another. The trial court not only heard testimony of medical witnesses as to the child's condition, but also testimony of the parents as to the basis for the assertion of religious conscience. On appeal from an adverse decision at the trial level, the Perricones argued that their constitutional rights of parental care and religious freedom had been violated.
Speaking for a unanimous Supreme Court in affirmance of the trial court, Justice Schettino considered appellants' argument that the trial court violated the First and Fourteenth Amendments to the Constitution of the United States and Art. I, par. 3 of our State Constitution, by depriving the parents of freedom of religion and their rights as parents. On the parents' side of the scale, Justice Schettino placed: the position of the parents in accord with the tenets of their religion and that they had at all times acted sincerely with the best interests of their child in mind (37 N.J. at 471); "freedom of religion and the right of parents to the care and training of their children are to be accorded the highest possible respect in our basic scheme" (at 472); freedom of conscience and freedom to adhere to a form of worship embraces two concepts  freedom to believe and freedom to act, the first being absolute, the second limited (at 472).
On the State's side, the Justice placed: the State's sovereign right and duty to care for a child and protect him from neglect or abuse during his minority (at 475); the medically proven necessity of the blood transfusion to save life or mental health (at 477); the imminent danger, as opposed to situations where corrective surgery is sought (at 478). In reference to the latter situation, Justice Schettino said:
Had there been a relevant and substantial difference of medical opinion about the efficacy of the proposed treatment or if there were substantial evidence that the treatment itself posed a significant danger to the infant's life, a strong argument could be made in favor of appellants' position. No such evidence was here presented. The medical *76 testimony was unanimous in its endorsement of the necessity for immediate blood transfusions. [at 479]
In upholding the State's position, the Supreme Court concluded that the facts placed on the balance clearly evidenced a compelling necessity for the protection of the welfare of the child.
The intrusion into the religious life and parental authority in Perricone can be justified because the State, as parens patriae, is charged with protecting a child from "immediate and present danger," and the parents in the context of the case were unfit, cruel or neglectful.
In the case at bar can it readily be said that all parents are neglectful and unfit to explain sexual relations or to teach their children a moral way of life? Is the State, through the educational system, permitted to encroach upon the patterns and molding of a child's behavior in personal family or religious beliefs? Parental discipline, authority and respect diminish as the great sovereign state forces its way into the home as a foster parent. Some parents may be happy to be relieved of the obligation and responsibility. Others may feel that the constant eroding of their usefulness as parents portends great danger, and youth will look to the state, rather than the parent, for guidance.
The balancing test has found support in many law review articles. Two which contain complete analysis are: Clark, "Guidelines for the Free Exercise Clause," 83 Harv. L. Rev. 327 (1969), and Gianella, "Religious Liberty, Nonestablishment and Doctrinal Development (Part I. The Religious Liberty Guarantee)", 80 Harv. L. Rev. 1381 (1967).
The questions to be answered in the present case are the extent of the governmental interest in promoting this program of "Human Sexuality" and whether permitting a student to be excused therefrom will detract substantially from or prevent the success of an essential program. Plaintiffs' assertion of a right of conscience is more impressive than the scorecard which was presented by the defendant local *77 board, that 70% of the Junior Chamber of Commerce poll thought sex education was a good idea.
Defendants attempt to persuade the court that because in the recent school board elections the "pro-sex-education" candidates defeated the "anti-sex-education" candidates, an over-riding governmental interest and necessity is clearly demonstrated. This is completely unacceptable. If majority rule were to govern in matters of religion and conscience, there would be no need for the First Amendment.
The First Amendment, and particularly the "free exercise clause," was adopted to protect the one percent, one individual, one person, who is sincere in a conscientious religious conviction. Even if it were concluded that the government's interest is a tenable interest and that school boards have a right to proceed in conducting these courses in "Human Sexuality," is the manner in which they are proceeding reasonable? Insofar as the State Board permits local boards to adopt or reject the program, even if arguendo this is constitutionally permissible, is it essential to the State or local board to require children to attend over the objection of their parents?
Other questions are raised by Sherbert and Woody: is there no alternative method which would accomplish the State's plan or scheme without an intrusion upon the individual's conscience? Plaintiffs must show in this balancing of State against individual that plaintiffs' religious or conscientious values are truly sincere. Is it a fraudulent claim of conscience or privilege asserted to eliminate a personal inconvenience or to avoid an unwanted or unpleasant duty to society?
Is the individual who objects to the plan of the State required to commit a mortal or a venial sin? Is the individual called upon by the government to disavow his conscience or to accept an operational dogma which is in direct conflict and derogatory of his or her religious belief?
The case of Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the successor case to the *78 Scopes trial, in which the Arkansas statute prohibiting the teaching of evolution was struck down, does not sustain defendants' position here.
There is nothing inherently evil from a constitutional standpoint in teaching evolution or comparative religions as historical fact. The disputed area of evolution, still disputed after all these years, is a matter of one belief in a scientific fact which does not intrude as long as other doctrine of genesis is given to the children. Mr. Justice Brennan in his concurring opinion in School Dist. of Abington v. Schempp, 374 U.S. 203, 281-283, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) suggests that equal time may be one answer, but difficult of constitutional formulation. Epperson does clearly state that the First Amendment mandate is absolute and "forbids alike the preference of a religious doctrine or the prohibition of theory which is deemed antagonistic to a particular dogma." (393 U.S. at 106, 89 S.Ct. at 271-272).
In the case at bar what is taught is operational  how best to plan a future life and what conduct is acceptable  and which, according to plaintiff, is in direct conflict with or derogatory of plaintiffs' religious belief. The First Amendment stands ready, in the "free exercise" clause, to protect that person. Once it is shown that the state intrudes upon one's religious belief, the state, according to Sherbert, has the burden of showing an overriding need and that it has no other way to satisfy that need.
If the state can demonstrate that no satisfactory alternative exists, then the interest of the state and the individual must be balanced. It may be that the individual's conscience may be fully protected by excusal from the program, or it may be that attendance is required because failure to perform the imposed duty has a harmful effect upon society generally and therefore involves a detriment to others. For example, a person may be required to take a smallpox or measles innoculation because failure to submit to injection may affect the health and welfare of many others in the community. There the state program is found to have an overriding purpose.
*79 However, in dealing with persons who are fully consenting (unlike the situation in Perricone, supra), it may be that if an act is against religious belief and harms no other person, that person may be excused from submitting. For example, in the area of injections of penicillin and surgical procedures upon those people who practice Christian Science. It should be apparent that, in a "free exercise" case requiring a balancing approach, judicial determinations are not solely answers to questions of law on summary judgment. Facts must either be proven or stipulated and then balanced before a legal standard can be applied and judgment rendered.
The motion of defendants for summary judgment is denied and an early pretrial conference date will be fixed.