Filed 1/19/24  P. v. Black CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Siskiyou)

----

| | |
|---|---|
| THE PEOPLE, | C096897 |
| Plaintiff and Respondent, | (Super. Ct. No. SCCR-CRF-2021-320-1) |
| v. | |
| SIVA BLACK, | |
| Defendant and Appellant. | |

Appointed counsel for defendant Siva Black filed an opening brief that sets forth the facts of the case and asks this court to review the record and determine whether there are any arguable issues on appeal.  (*Conservatorship of Ben C.* (2007) 40 Cal.4th 529.)  After considering defendant's supplemental brief, we conclude there are no arguable issues that would result in a more favorable outcome to defendant and affirm.

1

BACKGROUND

In March 2021, defendant was charged in Siskiyou County case No. SCCR-CRF-2021-320-1 with assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1); statutory section citations that follow are found in the Penal Code unless otherwise stated); exhibiting a deadly weapon to a peace officer with the intent to resist and prevent arrest and detention (§ 417.8); and resisting, delaying, or obstructing a peace officer (§ 148, subd. (a)(1)). The complaint alleged a prior 2013 Massachusetts conviction for assault to commit murder with a knife as a prior serious felony (§ 667, subd. (a)(1)) and a prior strike conviction (§§ 667, subd. (b)-(i), 1170.12).

In May 2021, the trial court declared a doubt as to defendant's competency pursuant to section 1368 and suspended criminal proceedings. Defendant appealed the court's order, and in case No. C094429 this court dismissed the appeal after finding the order nonappealable.

In July 2021, the trial court denied defendant's *Marsden* (*People v. Marsden* (1970) 2 Cal. 3d 118) motion. Defendant appealed in case No. C094612; this court dismissed the appeal after concluding defendant appealed from a nonappealable order.

In September 2021, the trial court denied defendant's request to be heard on a motion to suppress given that criminal proceedings remained suspended.

In October 2021, the trial court found defendant incompetent to stand trial. Defendant appealed in case No. C095200, and, after examining the notice of appeal, this court dismissed the appeal as premature.

In November 2021, the trial court committed defendant to Napa State Hospital for treatment for no more than two years. At that time, the court found defendant had the capacity to accept or refuse medication. Defendant appealed the order in case No. C095417. Because defendant was later restored to competency and the matter was

2

resolved by plea, this court dismissed the appeal from the court's November commitment order.

After some initial delay, by June 2022, defendant had been transported to Napa State Hospital. During a medication review hearing in July 2022, an administrative law judge found by clear and convincing evidence that defendant lacked the capacity to make decisions regarding antipsychotic medication, that his mental disorder required treatment with antipsychotic medication, and without such treatment it was probable that serious physical or mental harm would result. The administrative law judge ordered that the hospital could involuntarily medicate defendant until August 16, 2022, but that any involuntary medication beyond that date required a court order.

In an August 4, 2022, report under section 1370, subdivision (b)(1), a forensic psychologist opined that defendant was not yet competent to stand trial and should be retained for further treatment; defendant repeatedly declined to be interviewed. According to the report, defendant met the Diagnostic and Statistical Manual of Mental Disorders – Fifth Edition (DSM V) criteria for having unspecified schizophrenia spectrum and other psychotic disorder. He suffered from a history of delusions and paranoid ideation. The role of substance abuse in exacerbating defendant's symptoms was unclear. He admitted regularly using cannabis, alcohol, and ecstasy for extended periods of time since his youth, and stated he had experimented with cocaine and Vicodin, but denied using Ayahuasca and became guarded in his response. More information was needed to diagnose him with a substance use disorder.

The report detailed previous evaluations, which found defendant repeatedly denied having any mental health issues and concluded that he did not appear to have the capacity to discuss the alleged offenses in a rational or coherent manner; his ongoing psychotic processes continued to impair defendant's ability to engage in a reality-based, organized, meaningful discussion about his legal case and decisional considerations. Defendant's numerous writings to the court exhibited persecutory delusions, including that he had

3

been targeted by a white supremacist military and Christian cartel, that he believed the judge falsely imprisoned him based on his refusal to interview, and that the public defenders were colluding to keep him locked up, and grandiose delusions, including that he is an "independent regulator of Ayahuasca temples in the U.S., and is exempt from following the law."

The Department of State Hospitals subsequently petitioned the court for an involuntary antipsychotic medication order under section 1370, subdivision (a)(2)(D)(iv). The petition similarly alleged that defendant required the administration of antipsychotic medication because he lacked the capacity to make medication decisions, his mental disorder required medical treatment with antipsychotic medication, and without such treatment serious harm to defendant's mental or physical health was probable.

At the hearing on the petition, Dr. Ahmed, a Napa State Hospital psychiatrist who had worked with defendant for about six weeks and had treated defendant with antipsychotic medication for approximately 10 days to two weeks following the administrative law judge's temporary order, testified defendant was currently diagnosed as schizophrenic with an unspecified psychosis disorder. Defendant's symptoms included paranoid ideation; he believed that the judge and his attorney had conspired against him, and he refused to be evaluated for treatment or engage in therapy sessions. He also refused to meet with an assigned social worker with the name "Christian."

Dr. Ahmed had assessed approximately 500 patients for involuntary medication orders over the past seven years. He opined that defendant was not aware of his psychiatric illness, and that he was unable to evaluate the benefits and risks of taking antipsychotic medication. Defendant lacked the capacity to make antipsychotic medication decisions, and, in Dr. Ahmed's opinion, there were no other treatment options available to treat paranoia.

At a continued hearing on August 18, 2022, Dr. Ahmed testified that defendant's paranoia impacted his mental health by causing him to isolate and not engage in any

4

treatment or evaluations, or to utilize any mental competency material. Defendant exposed himself to other patients that were more severely mentally ill, which concerned Dr. Ahmed because defendant seemed unable to stop himself which could lead to dangerous situations. Defendant distrusted his treatment team, the nurses, and refused to communicate with a staff member named Christian. In Dr. Ahmed's opinion, defendant would refuse to take the needed medication unless court ordered.

Treating defendant with antipsychotic medication, according to Dr. Ahmed, would reduce his mental health symptoms, improve his insight and judgment, and allow him to regain competency; without treatment, defendant's symptoms would continue to worsen. Medication would also improve defendant's daily living and his interactions with his peers and treatment staff.

Defendant was currently being treated with a small dose of antipsychotic medication, and although Dr. Ahmed had not seen a huge improvement, defendant was able to better tolerate longer conversations. It generally took about 90 days to reach therapeutic levels that helped alleviate mental health symptoms.

Because the medicine could have adverse side effects such as constipation, stomach pains, and weight gain, patients were routinely monitored to manage potential effects. While defendant claimed the medication caused high blood pressure, Dr. Ahmed testified that defendant's blood pressure was normal and would be monitored.

Defendant allegedly objected to being involuntarily medicated based on religious grounds. Dr. Ahmed, however, testified that defendant had never told him that the reason he did not want to take the medication was based on his religion, nor had defendant ever talked to Dr. Ahmed about his religious beliefs.

Defendant testified on his own behalf. He had been sadhu, or a self-appointed monk, since 2005, which is why he isolated from others. He studies Kabbalah literature. He testified that his objection to taking medication was because he could only be dependent on "the deity."

5

When asked whether his exercise of free religion included not having mind-altering substances, defendant responded, "no." He explained that he already used psychotropic substances as part of his religion, which connected his mind to the "godhead" or "super soul," the "higher deity." The drugs that defendant took worked like peyote, expanding defendant's mind and "invad[ing] [his] free will."

Defendant had been taking the oral antipsychotic medication after the temporary order because he did not want to be forcibly injected. He believed the medication was harming his short-term memory and killing his brain cells. According to defendant, he was not required to participate in therapy, and he was not incompetent. Defendant denied having schizophrenia.

During closing remarks, defense counsel argued the People failed to satisfy the *Sell* (*Sell v. United States* (2003) 539 U.S. 166) factors for involuntarily medicating a defendant for the purpose of restoring him or her to competency. The court took the matter under submission.

The next day, the trial court granted an order authorizing involuntary medication. The court found, pursuant to section 1370, subdivision (a)(2)(B)(i)(I), that defendant lacked the capacity to make decisions regarding antipsychotic medication and if his mental disorder was not treated, serious harm to his physical or mental health would probably result.

Based on Dr. Ahmed's testimony, the court found that the purpose of the medication was not only to restore defendant to competency but also to improve his daily living, interactions, and insight, including participation in therapeutic programs. Thus, the court rejected defense counsel's argument based on *Sell*. In any event, even if the only reason for the medication was to restore competency, the court found the People had met their burden of satisfying the *Sell* factors, including that (1) defendant was charged with a serious crime against a person; (2) involuntary medication of antipsychotic medication was substantially likely to render the defendant competent to stand trial;

6

(3) the medication was unlikely to have side effects that interfere with the defendant's ability to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a reasonable manner; and (4) that less intrusive treatments were unlikely to have substantially the same results and antipsychotic medication was in the patient's best interest in light of his medical condition. Defendant timely appealed the involuntary medication order.

## DISCUSSION

Appointed counsel filed an opening brief setting forth the facts of the case and asking this court to review the record and determine whether there are any arguable issues on appeal. (*Conservatorship of Ben C.*, *supra*, 40 Cal.4th 529.) Defendant was advised by counsel of the right to file a supplemental brief within 30 days of the date of filing the opening brief.

Defendant filed a supplemental brief. As best we can understand, defendant claims he was raised inside of a government-police syndicate or cult that engaged in Aryan catholic abuse. His first key memory at age five, which was installed by the parens patriae syndicate in Simi Valley, locked his brain "to Mikal high priest and to *greyskull*," defendant's name in the "God-circuit," and since then, his mind was permanently chained to the memory, and consequently, "susceptible to it as an inroad on the security of his mind and his God-circuit, and to create a mind-war cycle in the brain that goes on and on, an intended eventual schism of the brain—crossed [third] eye, to make a caduceus, all-seeing eye, occult doctrine." He alleges that a government project known as " 'project stargate' " makes "puppet-ziggurats, including with Ayahuasca which was introduced to [defendant] in 2005 by the syndicate, and is engaged nationally in a 'mind-war' " somehow involving defendant's religion "cult of Santo Daime" and the " 'God Shiva.' "

7

As best we can discern, defendant's supplemental brief raises numerous issues that are not cognizable in this appeal from the involuntary medication order, and we do not address them. Such matters include issues related to the following: a 2009 criminal prosecution in Massachusetts and a previous schizophrenia diagnosis in that case; alleged Internal Revenue Service claims of charity fraud against two Ayahuasca-based charities in Oregon and what defendant characterizes as "federal government stalking"; a discontinuation of "PUA funds" and ordered repayment of funds previously disbursed; the propriety of an alleged warrantless search under the Fourth Amendment and being locked out of three consecutive locations in Mount Shasta; an attack by armed persons on his campsite in February 2021; whether the state willfully prosecuted defendant under a different name other than his monk's moniker and correct name "Siva de Simon Greyskull Black"; violation of the 13th Amendment, which generally prohibits slavery and involuntary servitude; whether state actors or governmental departments exercised a government-orthodoxy religion; and the validity of his plea.

Furthermore, to the extent defendant failed to appeal from the underlying judgment following his plea, defendant "cannot now be permitted to make a direct attack upon his convictions" or the plea. (*People v. Webb* (1986) 186 Cal.App.3d 401, 410; see also § 1237, subd. (a) [an appealable judgment is generally rendered at the time of sentencing]; Cal. Rules of Court, rule 8.308(a) [a notice of appeal must be filed within 60 days after the judgment or order being appealed to confer appellate jurisdiction].) Thus, issues that could have been raised in an appeal from the judgment on his criminal convictions, but which were not because defendant failed to timely appeal, are also not at issue in defendant's present appeal.

Turning to the involuntary medication order on appeal, defendant argues the order is void because it violated his religious beliefs. We disagree.

The United States Constitution and California Constitution prohibit involuntary medication that burdens a patient's free exercise of religion, unless a compelling state

interest outweighs the patient's interests in religious freedom. (U.S. Const., 1st Amd. & 14th Amd.; Cal. Const. art. I, § 4; *People v. Woody* (1964) 61 Cal.2d 716, 718; *State Dept. of State Hospitals v. A.H.* (2018) 27 Cal.App.5th 441, 446-447 (*A.H.*).) We review the court's order for substantial evidence. (*People v. Avila* (2009) 46 Cal.4th 680, 701; *People v. Jones* (1990) 51 Cal.3d 294, 314.)

Defendant bore the burden of showing that; (1) he sought to engage in the exercise of religion and (2) that the involuntary psychotropic medication order substantially burdened the exercise of his religion. (*A.H.*, *supra*, 27 Cal.App.5th at pp. 445-446.) Here, there is no credible evidence that defendant's objection to the involuntary medication order was based on a sincerely held religious belief or substantially burdened defendant's exercise of his religion.

Dr. Ahmed testified that defendant never told him that the reason he did not want to take the medication was based on his religion, nor had defendant ever talked to Dr. Ahmed about his religious beliefs. When asked whether his religious beliefs precluded him from taking mind-altering substances like antipsychotic medication, defendant replied that they did not. Instead, he testified that he already used psychotropic substances as part of his religion, which connected his mind to the "godhead." Based on Dr. Ahmed's and defendant's testimony, substantial evidence supports the trial court's implied finding that defendant could still practice his religion while simultaneously taking antipsychotic medication, even if the medication was a different psychotropic substance than the one he readily admitted ingesting as part of his religion.

To the extent defendant contends the trial court made the involuntary medication order to punish him for not participating in mental health evaluations at Napa State Hospital, essentially resulting in slavery, or that the judge simply wanted to "wear [his] spirit" like he was "a god," nothing in the record supports such speculation. Dr. Ahmed, who had assessed nearly 500 patients for involuntary medication orders over a seven-year period, testified that defendant suffered from schizophrenia and an unspecified psychotic

9

disorder, which resulted in significant delusions and paranoia that led defendant to act in dangerous ways. Dr. Ahmed explained that the only treatment for defendant's diagnosed mental illness, which defendant refused to acknowledge, was antipsychotic medication, and in the absence of such medication, defendant's symptoms would worsen over time. Defendant, in Dr. Ahmed's opinion, lacked the capacity to make antipsychotic medication decisions.

In granting the involuntary medication order, the trial court carefully considered the case files and the moving papers as well as Dr. Ahmed's and defendant's testimony at the hearing on the petition. After weighing the benefits and risks of taking the currently prescribed Zyprexa (Olanzapine), the court found, pursuant to section 1370, subdivision (a)(2)(B)(i)(I), that defendant lacked the capacity to make decisions regarding antipsychotic medication, that his diagnosed mental disorder required treatment with such medication, and if his mental condition was left untreated, it was probable that serious harm to defendant's mental health would result. On this record, we cannot conclude the court erred in so finding.

Finally, we reject defendant's argument that sections 1369 and 1370 unconstitutionally violate his right to defend himself or to a speedy trial. The claim is forfeited because defendant did not raise these specific objections below. (See e.g., *People v. Fuiava* (2012) 53 Cal.4th 622, 691 [defendant forfeited his claim that prosecutor's actions constituted an improper attempt to interfere with defendant's ability to exercise his constitutional right to 'compulsory process' by failing to raise a claim of compulsory process violation in the trial court].)

10

DISPOSITION

The order permitting involuntary antipsychotic medication is affirmed.

_____
HULL, Acting P. J.

We concur:

_____
BOULWARE EURIE, J.

_____
MESIWALA, J.

11