Mark A. **DOTTER**

v.

**MAINE EMPLOYMENT SECURITY COMMISSION.**

Supreme Judicial Court of Maine.

Argued March 2, 1981.

Decided Oct. 19, 1981.

Asen & Landis, Peter J. Landis (orally), Portland, for plaintiff.

Susan P. Herman, Asst. Atty. Gen., Maine Employment Commission, Augusta (orally), for defendant.

Walker, Bradford & Hull, Richard A. Hull, III, Biddeford, for Thornton Academy.

Before McKUSICK, C. J., and WERNICK,* GODFREY, NICHOLS, GLASSMAN,** and CARTER, JJ.

GODFREY, Justice.

The Maine Employment Security Commission appeals from a judgment of the Superior Court ordering that Mark Dotter be granted unemployment benefits following his resignation from Thornton Academy. On appeal the Commission argues that the presiding justice erred as a matter of law in concluding that to deny Dotter unemployment benefits would violate his First Amendment right to the free exercise of religion. We affirm the judgment.

Since May of 1972 appellee Mark A. Dotter has been a member of the Divine Light Mission, a religious faith currently headed by Guru Maharaji. During the year the Divine Light Mission holds three major festivals: Holi, which is celebrated in late March or early April; Guru Puja, which is held in July; and Hans Jayanti, which falls in November. At these festivals members of the sect gather with Guru Maharaji to engage in spiritual discourse. Each festival lasts several days.

* Wernick, J., sat at oral argument and in the initial conference but retired before this opinion was adopted.

** Glassman, J., sat at oral argument and in the initial conference but died before this opinion was adopted.

At the beginning of the school year of 1973 Dotter was hired by Thornton Academy as a teacher of English and remedial reading. During 1973, 1975, and early 1977, Dotter requested and received permission from Thornton Academy to take time off from teaching in order to attend the religious festivals. The Academy granted these requests with increasing reluctance, however. On November 3, 1977, James Jortberg, the headmaster of Thornton Academy, informed Dotter by letter that "the teacher contract must be adhered to to the letter pertaining to personal days" and that "any extensions of the one personal day will be scrutinized."

Despite this indication of dissatisfaction, Dotter sought permission to attend the Hans Jayanti festival from November 6 through November 9, 1978. A conversation ensued in which headmaster Jortberg attempted to persuade Dotter not to attend the festival. After that conversation Dotter had the impression that he had three choices in the matter: he could forego the festival, attend the festival and risk being dismissed, or resign. Dotter chose the third alternative and tendered his resignation on October 10, 1978.

On November 27, 1978, Dotter filed with the Maine Employment Security Commission a claim for unemployment compensation benefits. The local deputy for the Commission found that Dotter was eligible for unemployment benefits because he had left his position at Thornton Academy "voluntarily with good cause attributable to such employment." Specifically, the deputy found as a fact that Dotter had been put to a choice between missing the festival or resigning.

Thornton Academy appealed the deputy's decision to the Appeal Tribunal of the Maine Employment Security Commission. Following a hearing, at which Dotter and Jortberg testified, the Appeal Tribunal modified the decision of the deputy. The Tribunal ruled that under the Employment Security Law, an individual is disqualified for unemployment benefits if he leaves employment for reasons that are not directly related to his work. Because, in the Tribunal's view, Dotter had resigned because of personal preference rather than an inability to perform his job, he left employment for reasons that were not directly related to his work. Accordingly, Dotter was temporarily disqualified from unemployment benefits under 26 M.R.S.A. § 1193(1) (1977).[1]

Next, Dotter appealed the decision of the Appeal Tribunal to the Employment Security Commission as a whole, requesting another hearing. The evidence presented at the second hearing was essentially the same as that presented at the first. On May 9, 1979, the Commission issued its decision on the appeal. Because no new substantial evidence was presented at the second hearing, the Commission adopted the Appeal Tribunal's findings of fact. The Commission also concurred in the Appeal Tribunal's legal conclusion that Dotter had resigned voluntarily, without good cause attributable to his employment, and hence was temporarily ineligible for unemployment benefits.

Having exhausted his remedies before the Employment Security Commission, Dotter duly appealed the Commission's decision to the Superior Court pursuant to 5 M.R.S.A. § 11001 and 26 M.R.S.A. § 1194(8) (1979). In his complaint for review of governmental action, Dotter alleged, among other things, that the Commission's decision violated his right to the free exercise of religion guaranteed by the First Amendment to the United States Constitution and Article I, Section 3 of the Maine Constitution; and that the decision violated his right to equal protection of the laws guar-

---

1. At the time of the Appellate Tribunal's decision, section 1193(1) provided, in pertinent part:
 An individual shall be disqualified for benefits:
 1. For the week in which he left his regular employment voluntarily without good cause

attributable to such employment . . . and disqualification shall continue until claimant has earned 4 times his weekly benefit amount
. . . .

P.L. 1977, ch. 472, § 1.

anteed by the Fourteenth Amendment to the United States Constitution and Article I, Section 6–A of the Maine Constitution. For relief, Dotter requested the Superior Court to vacate the Commission's decision and to declare him fully eligible for unemployment benefits.

On July 30, 1980, the Superior Court justice rendered his order in regard to Dotter's appeal. The court vacated the Commission's decision and remanded the case for the entry of an order awarding Dotter his requested unemployment benefits. As a threshold matter the judge found that there was a direct relationship between Dotter's resignation and his desire to attend the religious festivals. Although the Divine Light Mission did not require attendance at the festivals and did not require its members to refrain from work during the festivals, the festivals nevertheless were a prominent aspect of the religion's form of worship. Dotter's choice to attend the festivals, although in a sense "personal," was based on an important tenet of his faith. Consequently, Thornton Academy's refusal to allow Dotter to attend the festivals placed a burden on the exercise of his religion. Because the Commission had shown no compelling state interest in denying Dotter unemployment benefits, the court held that this denial of benefits constituted a violation of Dotter's First Amendment right to the free exercise of his religion.

On appeal, the Commission argues that Dotter had the burden of showing that the Commission's refusal to grant him unemployment benefits constituted a substantial interference with the free exercise of his religion. In the Commission's view, Dotter established only that he desired to attend the religious festivals as a matter of personal preference inasmuch as non-attendance at the festivals did not violate a cardinal tenet of his religion and his faith did not preclude him from working during the festival periods. Furthermore, if it were to be assumed arguendo that Dotter's free-exercise rights were substantially infringed, the Commission contends that the state has a compelling interest in restricting unemployment benefits to those persons who leave their regular employment "voluntarily without good cause attributable to such em-

work involuntarily for reasons objectively related to their employment. Such restriction encourages people to stay at their jobs and inhibits resignations motivated by a desire to gain unemployment benefits. The Commission further argues that the state has a compelling interest in ensuring that teachers are available to meet the needs of Maine's students. According to the Commission, whatever burden was placed on Dotter's exercise of his religion was outweighed by the state's compelling interests.

Dotter disputes the Commission's interpretation of the free-exercise clause. In Dotter's view, once he showed that the Commission directly or indirectly placed any burden on the free exercise of his religion, the Commission was required to show a compelling interest in imposing that burden. Because he had shown a direct relationship between his resignation and his frustrated desire to attend the religious festivals, Dotter argues that he raised a *prima facie* free-exercise claim. He asserts that it was immaterial that his religion did not absolutely require him to attend the religious festivals. Finally, he contends that the Commission has failed to show a state interest sufficiently compelling to outweigh his interest in religious freedom.

We concur in the Superior Court's decision and reasoning: namely, that Dotter established a valid free-exercise claim and that the Commission did not establish a compelling state interest justifying its interference with one of his religious practices.

### A. The Statutory Framework

Under the Maine Employment Security Act, a claimant is temporarily disqualified from receiving unemployment benefits if he leaves his regular employment "voluntarily without good cause attributable to such employment . . . ." 26 M.R.S.A. § 1193 (1979). This Court has previously defined the phrase "good cause" as contemplating objective difficulties such as physical inability to perform the employee's usual job. The

requirement of an objective impediment to working serves to prevent employers from being assessed for benefit payments resulting from employee conduct that is beyond the employer's control and substantially within the employee's unconstrained discretion. *Therrien v. Maine Employment Sec. Comm'n,* Me., 370 A.2d 1385, 1389 (1977).

Dotter does not contend that the statutory temporary disqualification from receiving unemployment benefits is unconstitutional on its face. Rather, he argues that the First Amendment guarantee of the free exercise of religion precludes the Commission from applying that disqualification to him. We agree that the statute is constitutional on its face. Apart from the fact that Dotter's resignation was the result of his religious beliefs, our past interpretation of the statute would lead to the conclusion that his purpose in resigning would not represent "good cause attributable to" his employment. If the statute is to be found inapplicable to Dotter, it must be because application of the statute would unconstitutionally infringe his right to the free exercise of his religion.[2]

### B. The Free Exercise Claim

█ We need not decide, in the abstract, the extent to which governmental action need impinge upon a religious practice in order for the practitioner to raise a free-exercise claim. The United States Supreme Court has made clear that when a state denies unemployment benefits because the worker has engaged in conduct mandated by religious belief, "thereby putting substantial pressure on the adherent to modify his behavior and to violate his beliefs," a substantial interference with the worker's free exercise of religion exists. *Thomas v. Review Board,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624, 634 (1981). *See also Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963).

The Commission argues that before Dotter may assert a constitutionally protected interest in the free exercise of religion he must show a substantial interference with a

practice that is an *indispensable* aspect of his faith. In its most recent opinion on the subject the United States Supreme Court has held that a practice comes within the protective ambit of the Free-Exercise Clause of the First Amendment as long as it is rooted in an honest religious conviction. While the Supreme Court recognized the possibility that an asserted religious claim could be "so bizarre, so clearly unreligious in motivation, as not to be entitled to protection under the Free Exercise Clause," the Court ruled that if the plaintiff's belief is the religious significance of the practice is sincere, it is immaterial whether the plaintiff's faith absolutely mandates the practice.

> [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Board,* 450 U.S. at 716, 101 S.Ct. at 1431, 67 L.Ed.2d at 632. In so holding, the Court reflected the position adopted by the majority of federal and state courts. *See, e. g., Lewis v. Califano,* 616 F.2d 73 (3rd Cir. 1980); *Teterud v. Burns,* 522 F.2d 357 (8th Cir. 1975); *Chapman v. Pickett,* 491 F.Supp. 967 (C.D.Ill. 1980); *Lincoln v. True,* 408 F.Supp. 22 (W.D.Ky. 1975); *Frank v. State,* 604 P.2d 1068 (Alaska 1979); *People v. Woody,* 61 Cal.2d 716, 40 Cal.Rptr. 69, 394 P.2d 813 (1964).

In the present case, the Commission found that Dotter was given to understand "that if he was absent for the purpose of attending the festival he would face possible discharge." The Commission thus adopted as its finding of fact almost exactly Dotter's testimony in the following exchange:

---

**2.** *See* U.S.Const.Amend. I; Me.Const.art. I, § 3.

[Attorney for Thornton Academy]: Q.... Mr. Jortberg never did directly say he would discharge you if you went [,] did he?

MR. DOTTER: He led me to believe ... that would be the consequence ....

The Commission does not suggest that Dotter's understanding was in any way unreasonable in light of what Jortberg had said to him. The Commission, however, denied Dotter unemployment benefits because of its other finding that he left work because of personal motivations—because of the deep personal loss he would feel from not attending, even though he would suffer no "repercussion from the organization." In so holding, the Commission misapplied the law.

The Commission's decision to disqualify Dotter from receiving unemployment benefits effectively penalized him for choosing to resign from the Academy rather than forego his religious practices. If attendance at the festivals constituted a bona fide religious expression, the actions of the Commission resulted in an infringement of Dotter's interest in religious freedom.

There has been no suggestion in any of the proceedings below that Dotter's professed desire to attend the festival was insincere or motivated by non-religious concerns. The Commission found as a fact that the festival was a function of the Divine Light Mission and that Dotter would have suffered a deep personal loss if he had not attended it. Throughout the proceedings before the Commission Dotter had stressed the importance to him of congregating with other members of the faith at the festival to receive spiritual teaching from Guru Maharaji.

In these circumstances it is clear that the Commission failed to give proper deference to Dotter's reason for resigning from Thornton Academy. Although Dotter's desire to attend the festival was personal, it was also based on a sincere religious belief. Consequently Dotter's participation in the festival was a constitutionally protected form of religious expression, notwithstand-ing the fact that his attendance was not mandatory.

### C. The State's Competing Interests

■ The Employment Security Commission first argues that Thornton Academy has a compelling interest in ensuring that its teachers are not absent from the classroom for extended periods of time, even to attend religious functions. We recognize the importance of the Academy's concern for maintaining continuity in the relationship between teacher and pupil. However, we must conclude that the Employment Security Commission may not justify "disqualification" by invoking the Academy's interests as justification for its own action in temporarily disqualifying Dotter for unemployment benefits.

■ As the Superior Court noted below, the present case is not a dispute between private parties. Dotter does not challenge the Academy's refusal to allow him to attend the religious festival, but rather the Commission's refusal to grant him unemployment benefits following his resignation from the Academy. Whether a resigning claimant is temporarily disqualified for unemployment benefits does not depend on the reasonableness or strength of his former employer's interest in maintaining or terminating the employment relationship. The overriding purpose of the Employment Security Act is to alleviate the economic hardship incident to unemployment, on the premise that economic insecurity from unemployment is a menace to the health, morals, and welfare of all Maine citizens. 26 M.R.S.A. § 1042 (1974). *See Therrien v. Maine Employment Sec. Comm'n, supra,* at 1389; *Cornwall Indus., Inc. v. Maine Employment Sec. Comm'n,* Me., 351 A.2d 546, 552 (1976). Although the Act may have a subsidiary goal of promoting stability in the labor force, it pursues that goal only to the extent necessary to further its primary purpose; the temporary disqualification provisions within the Act do not discourage resignations or discharges generally, but rather serve to inhibit employees from leaving voluntarily or

getting themselves dismissed merely for the sake of obtaining unemployment benefits. *Therrien v. Maine Employment Sec. Comm'n, supra.* In short, if the Employment Security Commission is to assert a compelling interest in disqualifying Dotter, it must show that his disqualification is compelled by the purposes of the Act, and not merely that disqualification tends to further the separate interests of the Academy.

■ The United States Supreme Court has twice refused to characterize as "compelling" the state's interest in protecting the unemployment fund from claimants whose resignations were motivated by religious beliefs. *Thomas v. Review Board,* 450 U.S. at 719, 101 S.Ct. at 1432–1433, 67 L.Ed.2d at 634–35; *Sherbert v. Verner, supra,* 374 U.S. at 407, 83 S.Ct. at 1795 As in *Thomas,* there is no evidence in the record here that religiously motivated resignations are so common as to threaten widespread unemployment or serious depletion of the unemployment compensation fund. Although the Commission has a legitimate concern to prevent claimants from fabricating religious reasons for quitting their jobs, that concern alone does not justify a blanket denial of benefits to all persons who claim that their faith precludes them from continuing in their former employment. Even compelling state interests must be achieved by means that cause the least possible intrusion upon constitutionally protected interests. *Thomas v. Review Board, supra.* See also *Sherwood v. Brown,* 619 F.2d 47 (9th Cir. 1980); *Robinson v. Price,* 615 F.2d 1097 (5th Cir. 1980); *Moody v. Cronin,* 484 F.Supp. 270 (C.D.Ill. 1979). The Commission has neither shown nor even argued that it would be infeasible to attempt to distinguish fraudulent claimants from bona fide ones.

The entry is:

Appeal denied.

Judgment affirmed.

McKUSICK, C. J., and NICHOLS, J., concurring.

CARTER, J., dissenting.

CARTER, Justice, dissenting.

The issue on which the majority decides this case, whether the denial to plaintiff of entitlement to unemployment compensation benefits constituted an impermissible infringement upon his right to the free exercise of his religious beliefs under the First Amendment of the United States Constitution[1] and the Maine Constitution,[2] is not generated by the record. There is not substantial evidence to show that plaintiff was required to choose between his exercise of his religious beliefs and non-attendance at the festival in question. It is well established law that one who seeks to challenge the validity of a statute on constitutional grounds may not do so "... on the ground that impliedly it might also be taken as

---

1. The First Amendment to the Constitution of the United States provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

2. The Constitution of the State of Maine provides in Article I, § 3:

All men have a natural and unalienable right to worship Almighty God according to the dictates of their own consciences, and no one shall be hurt, molested or restrained in his person, liberty or estate for worshipping God in the manner and season most agreeable to the dictates of his own conscience, nor for his religious professions or sentiments, provided he does not disturb the public peace, nor obstruct others in their religious worship;—and all persons demeaning themselves peaceably, as good members of the State, shall be equally under the protection of the laws, and no subordination nor preference of any one sect or denomination to another shall ever be established by law, nor shall any religious test be required as a qualification for any office or trust, under this State; and all religious societies in this State, whether incorporate or unincorporate, shall at all times have the exclusive right of electing their public teachers, and contracting with them for their support and maintenance.

The scope of the right to religious liberty contemplated by this provision is co-extensive with that afforded by the First Amendment to the Federal Constitution. *Squires v. City of Augusta,* 155 Me. 151, 164, 153 A.2d 80, 87–88 (1959).

applying to other persons or other situations in which its application might be unconstitutional." *United States v. Raines*, 362 U.S. 17, 21, 80 S.Ct. 519, 522, 4 L.Ed.2d 524, 529 (1960); *State v. Richardson*, Me., 285 A.2d 842, 845 n.4 (1972). Where the attack upon the statute is on an "as applied" basis, the facts of the case must show that the claimed deprivation of rights, which is the basis of the attack, resulted from the application of the statute.[3]

The plaintiff does not here contend that the statute, 26 M.R.S.A. § 1193(1)(A) (Supp. 1980), is facially violative of the pertinent constitutional provisions. Rather, he contends that the statutory provision may not constitutionally be applied to deny unemployment compensation benefits to a person whose employment has been terminated because of adherence to his religious beliefs when adversely impacted upon, in some manner, by the requirements of his employment activity. To maintain such an attack, he must show himself to be a person so positioned. To make such a showing he must establish that he is one who was forced to choose between continued pursuit of an employment which became offensive to his religious beliefs and discharge.[4]

3. It is important to note that the plaintiff's contention is *not* that the Academy or Headmaster Jortberg violated plaintiff's First Amendment right to the free exercise of his religious beliefs. No claim is made herein against them, and they are not parties to this action. From anything that appears in this record, Thornton Academy is a private school. It is neither claimed nor is it indicated by evidence that the First Amendment imposes any impediment upon the Academy's legal right to deal with Dotter's request as it saw fit merely because the request was motivated by a matter involving his religious beliefs. The First Amendment impacts restrictively only upon *governmental* action inhibiting the free exercise of a citizen's religion. *See Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–35, 97 S.Ct. 1782, 1799–1800, 52 L.Ed.2d 261, 284 (1977).

Rather, the issue here focuses upon the *governmental* action of the Maine Employment Security Commission in denying the plaintiff access to its general benefit program in the face of plaintiff's claim that he was forced to terminate his employment because of a conflict between the requirements of the employment and his religious beliefs. The claim, properly stated, is that the *State's* refusal to make the benefits available where the employee is forced to terminate his employment because of such a conflict offends the Free Exercise Clause of the First Amendment. Thus, while the employer may be legally free to attempt to coerce the employee to meet the requirements of his employment, even in derogation of his religious beliefs, the State may not disentitle an employee who refuses to submit to such coercion from receipt of those benefits which other employees would be entitled to receive if they voluntarily terminated their employment for good cause attributable to the employment which was purely secular in its content. *See Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. Indiana Empl. Sec. Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981).

On such a theory, the conduct of the employer is properly looked to, not to judge its legality, but only to determine if the termination of the employment was *as a matter of fact* caused by a conflict between work requirements and religious scruples which forced the termination of employment in order that the employee's religious integrity might be maintained. If the termination of employment results from such a causative conflict, the Commission, as an instrumentality of government, infringes upon the employee's right to the free exercise of his religious beliefs by treating such cause for a "voluntary quit" differently than it does a secularly-based "voluntary quit" in the case of other claimants. If the termination of employment is not caused by such a conflict, the state agency may properly treat the employee in the same manner as other employees who terminate their employment *without* "good cause attributable to the employment."

4. Title 5 M.R.S.A. § 11007(4)(C)(5) provides for review of the administrative agency's findings of fact by the standard of "substantial evidence on the whole record." This is to be read in the light of § 11007(3) which states that on review, "[t]he court shall not substitute its judgment for that of the agency on questions of fact." We have recently held that in such cases, "[w]e review the administrative record to determine whether there is any *competent evidence* to support the findings of the Commission." *Tobin v. Maine Empl. Sec. Comm.*, Me., 420 A.2d 222, 224 (1980) (emphasis added). *See also Proctor v. Maine Empl. Sec. Comm.*, Me., 406 A.2d 905, 907 (1979). We have also held that there is no substantive difference between the "substantial evidence on the whole record" standard and the "clearly erroneous" standard generally applicable to appellate review of factual findings. *Stanford Highway Unit of Local 481 v. Town of Sanford*, Me., 411 A.2d 1010, 1013–14 (1980). *See* Field, McKusick and Wroth, *Maine Civil Practice*, § 52.7 at 330 (Supp. 1981). The administrative agency's

Before the Tribunal, Dotter testified that he had been an adherent to the Divine Light Mission since May 19, 1972. He said that he requested of his employer time off to attend ". . . various religious festivals all under the auspices of the Divine Light Mission" in four of the six years of his employment. These prior requests were made in November of 1973, 1975, 1977, and in March and April of 1977. School was in session during the period covered by each of these requests. Throughout his employment, Dotter was employed under a contract which required him to work 180 days each year. All of these requests were granted by his employer, the Academy. On the last occasion when such a request was granted, in November, 1977, approval was made by a written memo from the Headmaster, Mr. Jortberg, which also stated that further similar requests "will be scrutinized."

Dotter's first such request in 1978 was made personally to Headmaster Jortberg about September 29, 1978, seeking four teaching days off in November of that year to attend the Mission's Hans Jayanti Festival at Kissimee, Florida. That request prompted a discussion between the Headmaster and Dotter, which Dotter described before the Tribunal as follows:

> Well as I under, as I understand it I approached Mr. Jortberg with the desire for time off, for the days off. I asked him for days off in a private conversation

in his office and as I understand it at the time *I felt* I had three options. One was to not go which Mr. Jortberg encouraged me to do. He said, he suggested that I go on, during school vacations or during the summer but the festival was not being held during the school vacation or during the summer. Two would, well that, that was the first option *I felt* I had was not go. Second, that, we had some discussion about whether if, I were to just go the consequences of that were that, *I don't think he ever came right out and he said I'll fire you but I, I had the implication that that's what he would try to do* or would somehow remove me from service and three, if I wanted to go *I felt* that I had to resign if the other two weren't acceptable, to me.[5]

(Emphasis added.) He stated that when he made the request he "hoped" that it would be granted. When asked, "And, you, so you knew that if I may use the phrase . . . your string might be running out with respect to the school and these leave days during teaching time?" He responded, "No, I didn't feel that way." He said that he had no hesitation in talking to Jortberg about this request for time off during school.[6] He conceded that Jortberg never directly refused him the time off to attend the Festival. He was not told that he would be discharged for taking the time off. Rather, he said that Jortberg, in the discussion, "lead

---

findings of fact are to be upheld on judicial review if there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Sanford*, 411 A.2d at 1014.

5. In testimony on appeal to the Commission, Dotter described this discussion as follows:

> Well, the circumstances as I understand them the circumstances were that I desired to take four days off and if, from my job to attend a religious festival, the name of it Hans Jayanti, H-a-n-s J-a-y-a-n-t-i, in Orlando, Florida and the festival itself was sponsored by my spiritual teacher, a person by the name of Guru Maharaji, G-u-r-u M-a-h-a-r-a-j-i, and I asked to take some time, I asked [*sic*] for the days off, Mr. Jortberg some time in the end of September, the very beginning of October, for the four days off. One of the

days being a personal day and the other three days I asked to take off without pay. Mr. Jortberg and I discussed the situation and *I felt*, I left the discussion and *I felt* I had three options. One was not to go, one was to go and be fired and the third was to quit, I thought or to resign. *I felt* those were my three options and I chose to resign, rather than to not go, or to go and be terminated. (Emphasis added.)

6. Later, in questioning by the Referee, he said he felt "very apprehensive" about asking for the time off. This occurred at the point when Jortberg testified that in 1977 he had "expected Dotter to be "very apprehensive" about requesting more time off for these religious festivals.

me to believe" that he would be discharged.[7]

Headmaster Jortberg testified that he felt Dotter's resignation was a voluntary one. He said that he had indicated to Dotter in 1977 that he should

[a]dhere to one hundred eighty days that he's under contract with me for and that I just could not continue to do this and he, I think he knew this, over the last few years, he come each time a little more reluctantly, a little more hesitantly and so I, I felt that the alternative was not to resign or leave but yet indeed to go [to] it [the festival] another time and fulfill his contract with me.

In describing the discussion that occurred when Dotter requested the days off, Jortberg stated:

We, we did talk at length that day. It was indeed, I don't know the day right, the date but it was indeed a Friday and I think Mark came into my office at 2:30 and I think we didn't leave my office until 5 or 5:30 eating tomatoes together but I was trying to, I thought, convince [Dotter] that there must be other times to seek the Guru and I guess I used, I won't use all the other terms I might have used, but there must be other times and why not use the summer and if there is something in the summer because, you know, you owe something to me and the kids and, and, yes I felt that you did. Especially that there was another time to do it.

Jortberg was never asked if, in the absence of Dotter's resignation, he would have, or intended to, fire him if he took the time off to go to the Festival. To the extent that a determination as to those facts is pertinent to a conclusion as to whether the circumstances constituted an infringement upon Dotter's right to the free exercise of his religious belief, that determination is properly for the Commission to make from the evidence as fact-finder. Once made, such findings are to be treated as definitive on judicial review if there is in the record before the Commission "such relevant evidence as a reasonable mind might accept as adequate to support [such] a conclusion." *Sanford Highway Unit of Local 481 v. Town of Sanford*, Me., 411 A.2d 1010, 1014 (1980), *quoting In re Maine Clean Fuels Inc.*, Me., 310 A.2d 736, 741 (1973).

The Appeal Tribunal found as fact that:

(1) "In 1977, when the claimant's last request for time off for this purpose was granted, the employer strongly implied that further time off for such activities may not be granted."

(2) The claimant's request for time off in November of 1978 prompted "a long discussion . . . which left the claimant with the understanding that if he was absent for the purpose of attending the Festival he would face possible discharge because he was needed for those four days, or he could resign."

(3) "It was also suggested by the employer that he could forego the trip to the Festival . . . ."

(4) "The claimant believed that if he did not attend the Festival it would be a deep personal loss."

(5) "The claimant would not suffer any repercussions from the organization if he did not attend [the Festival]."

The Commission, in rendering its decision, adopted these findings of fact by the Appeal Tribunal.

On these found facts, the Tribunal concluded that, "the claimant, fully aware that the employer was not in favor of the claimant taking time off, *chose to resign* rather than yield his personal preferences to conform to the requirements of the employer." (Emphasis added.) The Commission in its decision concluded that " . . . the claimant's separation was voluntary without good cause attributable to such employment. . . ." Implicit in these conclusions is the factual finding that Dotter was not

---

7. Dotter's belief in this regard is best summed up in his testimony:

Anyway I felt I had to ask him, I, it was my feeling that he was not in favor of that. For his reasons. And that, and, and that if I had gone I would, that he would have, in all due respect to him, as administer [sic] of the school attempted to remove me from my job.

fired by the Headmaster and that he was not given a choice to stay on the job, on the one hand, or to be fired or to resign, on the other hand. In short, both the Tribunal and the Commission concluded that Dotter left by a "voluntary quit" without good cause attributable to his employment. The Tribunal impliedly found either that Dotter decided to resign for his own purposes regardless of what the Headmaster intended, or, alternatively, that he resigned on the basis of an unjustified assessment of the Headmaster's intent. Clearly, if the former is the case, the cause of termination of the employment was not attributable to the employment, and the Tribunal's decision was correct. The dispositive question, thus, becomes whether the implicit finding that Dotter proceeded on the basis of an unreasonably erroneous assessment of the Headmaster's intent was supported by "such relevant evidence as a reasonable mind might accept as adequate to support" it. I believe that it was.

The reasonableness of Dotter's belief is determined by whether it is based upon an accurate or reasonable perception of the Headmaster's intent. In the absence of any express statement in the record of what the Headmaster actually intended to do if Dotter took the time off, the Commission was required to deduce that intent from his conduct and words in the totality of the circumstances.

The evidence discloses a Headmaster, responsible for operating a school, who has the claimant under contract for 180 days of performance as a teacher. Over a period of several years, the claimant has sought and obtained, with increasing frequency, days off in order to attend religious festivals. Such absences from his contractual period of employment are viewed by the Headmaster as inconsistent with the claimant's obligations under his contract and with the interests of the school. On the latest occasion when further absence is requested, the Headmaster, consistent with his own interests and those of the school, undertook to persuade the claimant not to attend the Festival during a period when it would interfere with the performance of his contract obligations. The Headmaster and Dotter both testified that it was the Headmaster's suggestion that Dotter plan to attend the Festival at a later date when such a conflict with his contract obligations would not occur.

Even if it be justly inferred from their respective descriptions of the discussion had in the Headmaster's office that the Headmaster was taking a strong stance on the question of the propriety of Dotter's proposed absence during the month of November and was attempting to be vigorously persuasive in urging Dotter to forego the Festival,[8] there is nothing in this record which would compel the conclusion that he had then decided to discharge Dotter if he attended the Festival or to require him to resign if he did so. Viewed in the context of the school's action on past requests by Dotter for time off, every indication would seem to be that if Dotter insisted on attending the Festival he would be allowed the time to do so. The only fact external to the discussion in the Headmaster's office that weighs against that conclusion is that the Headmaster had indicated in 1977 that in the future such requests would be subject to careful scrutiny. That *caveat* cannot be treated as a pre-judgment of the action to be taken on any future requests for time off. It was justified by the increasing frequency of such requests by Dotter.

It cannot be said that the discussion in the Headmaster's office changed the school's position from what it had been previously in any way other than that, for the first time, the Headmaster attempted by persuasion to bring the number and frequency of Dotter's requests under some degree of control. Dotter and the Headmaster both agree that there was no specific refusal to allow the time off. He was not threatened with discharge nor asked to resign. They also agree that the Headmaster's comments were made in terms of encouraging Dotter to go to the Festival on

8. *See* footnote 3 *supra.*

some other occasion. The fact that the Headmaster based his plea on the proposition that "... You owe something to me and the kids...." shows that the Headmaster wanted Dotter in the classroom, not out of it. The employment of that approach weighs heavily against any formulation of an intent to discharge Dotter.

In the course of the two-hour discussion of the subject in the Headmaster's office, Dotter came away with only an "implication" or a "feeling" that he would be fired if he took the time off to attend the Festival. Even though Dotter drew such an implication from the conversation, he has not been able, in either of his descriptions of that conference, to point to any specific statement of the Headmaster that would, by itself or in combination with other specifically identified statements, justify such an implication as a reasonable interpretation of the Headmaster's conversation with him.

It may be that the Headmaster was doing his best to persuade this employee to perform his contract obligation and thus to avoid what would be the adverse consequence of his absence to the administration of the school and a disruption of the teaching program. In the context of the prior history of dealing with similar requests, the Commission and the Tribunal were certainly justified by the evidence in concluding that Dotter had misinterpreted the thrust of the Headmaster's conversation and had construed as mandatory that which the Headmaster meant to be only persuasive.

If the Headmaster had in fact decided to discharge Dotter, there was no reason not to tell him so. That would have the maximum persuasive force to discourage him from pursuing the request for time off. If that were the fact, one would suppose that it would directly serve the Headmaster's purpose better than subtle persuasion to attend the Festival on another occasion. The fact that the Headmaster did not deal with the situation in this way is indicative of an effort to appeal to Dotter's sense of duty and better nature and reflects a genuine concern to retain his services as a teacher.

It should be noted that the Commission and the Tribunal placed heavy emphasis upon what Dotter described as his "strong sense of personal loss" in arriving at their determinations that the termination came about as a result of a voluntary quit. Such emphasis is supported by Dotter's own testimony. There is ample relevant evidence to justify the Commission in concluding that Dotter had made up his mind that he was going to attend the Festival regardless of whether or not the Headmaster decided to discharge him and that his promptness in resigning was for the purpose of taking the decisive option away from the Headmaster. In either case, whether Dotter misjudged the Headmaster's intentions or whether he acted in deliberate disregard of those intentions, it cannot be said that he resigned because of any condition attributable to his employment that in any way impeded his attendance at the Festival.[9]

9. The record is insufficient to generate the constitutional issue on another significant point of the majority's analysis. It cites *Thomas v. Review Bd. Indiana Empl. Sec. Div.*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), for the proposition that a state substantially interferes with the worker's free exercise of religion when it "... denies employment benefits because the worker has engaged in conduct *mandated* by religious belief...." (Emphasis added.) At 1377–1378. The majority decision then proceeds on the assumption that Dotter's conduct in resigning was *mandated* by his religious beliefs. The word "mandated" is, I believe, the operative word in the language referred to in *Thomas*, 450 U.S. at 718, 101 S.Ct. at 1432, 67 L.Ed.2d at 634. It is clearly used to connote that

not every encumbrance upon the exercise of religious belief, however insubstantial, is violative of the Free Exercise Clause. It seems to me to limn a requirement that the conduct be motivated in some significant respect by the requirements of the worker's religious faith— that there be, at least by the dictates of the worker's own religious conscience, some degree of compulsion upon him to refuse to comply with the offending circumstance of the employment.

Whether such a "mandate" or sense of compulsion caused Dotter's conduct in resigning is a question of fact to be determined by the Commission. We are to respect any such finding if there was any relevant evidence to support it. *See* note 4, *supra*. Here, the Commis-

On this point, this case is much different than either *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), or *Thomas v. Review Board Indiana Employment Security Division*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), relied on by the majority. The distinction is of critical importance for purposes of determining whether it is appropriate for us to reach the constitutional issue. In *Sherbert*, the claimant was a member of the Seventh-Day Adventist Church who was discharged by her employer because she would not work on Saturday, the Sabbath day of her faith. Subsequently, she was unable to find other employment because of her unwillingness to work on Saturday, and she applied for unemployment compensation benefits which were denied by the state agency. *Id.* at 399–400, 83 S.Ct. at 1791, 10 L.Ed.2d at 967–8. On those facts, there could be no doubt but that she was denied the benefits because of her adherence to a cardinal tenet of her faith.

Similarly, in *Thomas*, the claimant, a Jehovah's Witness, terminated his job because his religious beliefs prohibited his participation in the production of armaments. He had been employed in the employer's roll foundry and was transferred to another department of his employer that produced turrets for military tanks. He resigned when his request for a layoff was denied by the employer. The state agency denied his application for employment compensation benefits by applying to him disqualifying provisions of state law.[10] *Thomas*, 450 U.S. at 709–712, 101 S.Ct. at 1427–1429, 67 L.Ed.2d at 628–30.

In both of these cases, the uncompromising character of the confrontation between the requirements of the claimant's employment and his religious tenets is clearly displayed. The claimant in each of these cases was presented with a "Hobson's Choice", either to relinquish an employment offensive to the employee's religious beliefs or to continue in that employment and thus to violate those beliefs. While in each case the relinquishment may be said to be voluntary in the sense that the employee made a conscious election not to dishonor firmly held religious tenets, the need to make that decision unquestionably arose out of the requirements of the employment. The thrust of *Sherbert* and *Thomas* is that where employment requirements force one to make such a decision the state may not, without violating the employee's right to be free to exercise his religious belief, refuse to extend to him a general benefit program on the theory that his termination does not arise out of the employment.

In the present case, there is ample evidence to support the Commission's factual finding that Dotter did not resign because he was forced to confront the "Hobson's Choice" faced by Ms. Sherbert and Mr. Thomas; the evidence shows that he voluntarily resigned before any such choice was clearly presented to him. He is not, there-

---

sion expressly found that "... [T]here was no compelling reason for claimant to attend a religious festival in another state except for personal beliefs." Implicit in that finding is a determination that his desire to attend the Festival was not compelled or "mandated" by his religious beliefs. Dotter gave as his only reason for attending the Festival that he would "suffer a deep personal loss" if he did not attend. It is undisputed on the record that he did not feel compelled to attend, that the faith did not require his attendance, and that the tenets of the faith required no particular observance of the period during which the Festival was held. It is manifest that Dotter would sustain neither censure nor disability in any way connected to his religion from a failure to attend the Festival. This clearly supports the Commission's conclusion that he "... chose to resign rather than yield *his personal prefer-*

ences to conform to the requirements of the employer." (Emphasis added.)

On such evidence, it cannot be said that the Commission had before it "no relevant evidence that a reasonable mind might accept as adequate to support" a conclusion that his desire to attend the Festival and his resignation of employment in order to do so, was *not* mandated or compelled by his religious beliefs. That finding should stand, and if it does, there is no conflict with the holding in the *Thomas* case.

10. "The referee concluded nonetheless that Thomas' termination was not based upon a 'good cause [arising] in connection with [his] work': as required by the Indiana unemployment compensation statute." *Thomas v. Review Bd. Indiana Empl. Sec. Div.*, 450 U.S. at 712, 101 S.Ct. at 1429, 67 L.Ed.2d at 630.

fore, so positioned as to be entitled to claim the protections accorded by the First Amendment to those who are in fact deprived of their employment as the consequence of the triumph of spiritual integrity over the need for material sustenance. The Constitution is not properly a vehicle for the redress of hypothetical wrongs. *United States v. Raines*, 362 U.S. 17, 22, 80 S.Ct. 519, 523, 4 L.Ed.2d 524, 529 (1960); *State v. Crocker*, Me., 435 A.2d 58, 68 (1981) (Carter, J., concurring).