Ambrose **FLYNN**

v.

**MAINE EMPLOYMENT SECURITY COMMISSION et al.**

Supreme Judicial Court of Maine.

Argued May 3, 1982.

Decided Aug. 9, 1982.

Harold Lichten (orally), Pine Tree Legal Assistance, Inc., Lewiston, for plaintiff.

Rufus E. Brown, Deputy Atty. Gen. (orally), Susan P. Herman, Peter H. Stewart, Asst. Attys. Gen., Maine Dept. of Labor Employment Sec. Com'n, Augusta, for defendants.

Before McKUSICK, C. J., and NICHOLS, ROBERTS, CARTER, VIOLETTE and WATHEN, JJ.

McKUSICK, Chief Justice.

The Employment Security Commission denied unemployment benefits to the claimant Ambrose Flynn on the ground he had been discharged from his job as a security guard at a Catholic hospital because of his own misconduct connected with his work. The misconduct consisted in talking about religion to employees and patients at the hospital in violation of the request his employer expressly made to him before he was hired. Although in this court Flynn does not contest the finding of misconduct, he nonetheless contends that denial of unemployment benefits to him violates his First Amendment right to the free exercise of his religion. On the facts of the present case, we reject the claimant's constitutional claim, and remand to the Superior Court (Androscoggin County) with direction to affirm the commission's denial of unemployment benefits.

On December 11, 1980, claimant Flynn began working for Carrier Detective Agency as a security guard at St. Mary's Hospital in Lewiston, a Catholic hospital that contracts with the detective agency for security services. Before commencing his duties, Flynn spoke at length with Camille Carrier, owner of the agency. As Carrier later recalled that conversation at an administrative hearing, he told Flynn that hospital officials had complained that previous guards had talked too much with patients and hospital employees. Carrier explained to Flynn that he was "to say yes and no only and to smile at people."[1]

---

1. Carrier feared that garrulous security guards could endanger his contract with St. Mary's Hospital. In his "Statement Supporting Deputy's Findings of Fact," plaintiff implicitly admitted his understanding of that rationale, de-

When Flynn mentioned that he had for six years belonged to the Franciscan Order, Carrier expressly forbade him to discuss that aspect of his life with anyone at the hospital. Flynn agreed not to divulge his past association with the Franciscans and raised no objection to the general instruction to minimize conversation on the job.

A week or two after hiring the present claimant Flynn, Carrier began receiving complaints from his supervisor at the hospital that Flynn was upsetting emergency room patients, including psychotic and suicidal persons, by talking about religion with them. Carrier summoned Flynn for a second discussion. Asked whether he recalled being instructed to limit his conversation, Flynn admitted that he did, but said he did not think he had talked excessively. At the subsequent hearing, he testified that he realized religion was a sensitive subject, but that he did not believe he had caused any harm and that his Christian faith required him to try to calm troubled souls in the way he did.[2] Carrier again ordered Flynn not to engage in unnecessary discussions at work, and to refrain entirely from discoursing on religion.

Nonetheless, about two weeks after that second discussion of the matter with Flynn, Carrier again heard complaints that he was proselytizing among both patients and staff. On January 13, 1981, Carrier and the present claimant had their third meeting. When Flynn told Carrier that he would continue talking as he had, Carrier discharged him.

One week later, Flynn applied for unemployment benefits from the Department of Manpower Affairs.[3] A deputy of the department made an initial determination that claimant should receive benefits and that they should be charged to Carrier's experience rating record.[4] Carrier took the case to the Appeal Tribunal, which conducted a hearing on March 4, 1981, and reversed the deputy's decision. The tribunal found as a fact that when hired, the claimant "was told it would be best if he not mention his prior vocation or discuss his religious convictions with patients or hospital employees," and that "the employer's request was reasonable in view of the environment in which the claimant was working." The tribunal also found that after Flynn began working at St. Mary's Hospital, "the employer's supervisor of the security guards at the hospital reported to [the employer] that there had been complaints that the claimant was discussing religious beliefs with hospital personnel while on duty." As a matter of law the tribunal concluded that "the claimant's actions and statements constituted insubordination and a deliberate disregard of the employer's best interests which is deemed to be misconduct connected with his work and in connection with the employment." The claimant appealed the tribunal's decision to the Commission, which affirmed and adopted it. On a Rule 80B appeal, the Superior Court affirmed the finding that Flynn was guilty of misconduct connected with his work, but nonetheless held the Commission constitutionally bound to pay unemployment benefits to Flynn.[5] On appeal we reverse the latter holding of the Superior Court.

claring "[m]y employer is only interested in keeping his contract at St. Mary's."

2. Plaintiff admitted that he comforted patients by asking "why don't you turn to Jesus Christ and ask Christ to come into your heart," and "tell[ing] them about God's unconditional love and acceptance for them." He denied having discussed religion in the cafeteria with hospital employees, although Carrier testified that he had received complaints to that effect. The record is replete with evidence that plaintiff regarded it as his "duty to almighty God" to talk about his faith; hence there is no doubt that plaintiff's conduct was "rooted in an honest religious conviction." *Dotter v. Maine Employment Security Comm'n*, Me., 435 A.2d 1368, 1372 (1981).

3. The Department of Manpower Affairs has since been renamed the Department of Labor. *See* P.L. 1981, ch. 168.

4. *See* 26 M.R.S.A. § 1221(3) (1974).

5. The complaint asserted as the basis for the action in Superior Court both an administrative appeal under M.R.Civ.P. 80B and a constitutional claim under 42 U.S.C. § 1983 (1976). The justice below conducted no factfinding but heard oral argument before reversing the com-

■ An individual is temporarily disqualified for unemployment benefits if he is "discharged for misconduct connected with his work." 26 M.R.S.A. § 1193(2) (1974). The legislature has defined "misconduct" to mean

> conduct evincing such willful or wanton disregard of an employer's interests as is found in deliberate violations or disregard of standards of behavior which the employer has a right to expect of his employee, or in carelessness or negligence of such degree or recurrence as to manifest equal culpability, wrongful intent or evil design, or to show an intentional and substantial disregard of the employer's interests or of the employee's duties and obligations to his employer.

26 M.R.S.A. § 1043(23) (1974). Notwithstanding some language in that definition suggesting a subjective standard, the test for statutory misconduct is necessarily conducted under an objective "standard of reasonableness under all the circumstances." *Therrien v. Maine Employment Security Comm'n*, Me., 370 A.2d 1385, 1389 (1977).

■ The Superior Court was plainly correct in affirming the administrative finding of statutory misconduct. The claimant's repeated discussions about religion with hospital patients and staff, coming as they did after plaintiff had received from Carrier explicit directions at the time he was hired not to engage in such conversations, constituted a blatant disregard of his employer's interests and a violation of standards the employer could reasonably have expected his employee to honor. Flynn's transgression all the more clearly fits the definition of misconduct because of evidence in the record that he understood that such conduct could endanger his employer's contract with the hospital.[6]

The claimant argues, and the Superior Court ruled, that notwithstanding that misconduct, the Commission violated the Free Exercise Clause of the First Amendment to

the United States Constitution by denying him unemployment benefits. The argument proceeds chiefly from two cases decided by the United States Supreme Court, *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), and *Thomas v. Review Board*, 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), and a third decided by this court, *Dotter v. Maine Employment Security Comm'n*, Me., 435 A.2d 1368 (1981). In *Sherbert*, a Seventh Day Adventist was fired because she refused to work on Saturday, her sabbath, after her employer began requiring Saturday labor. The claimant was administratively denied unemployment benefits because she would not accept work with other, similar employers in the area, all of whom required their employees to work on Saturday. In *Thomas*, a Jehovah's Witness who believed his faith forbade the manufacture of arms quit his job at a roll foundry when his employer transferred him to a division making tank turrets. He, too, was administratively denied unemployment benefits. And in *Dotter*, a private school teacher who for years had obtained leave to attend multiday festivals that were an important part of his religion, resigned when his employer finally refused him further leave. The Maine Commission held him ineligible for unemployment benefits. In all three cases, the ultimate court decision was that the denial of benefits constituted an unconstitutional burden on the claimants' right to the free exercise of religion.

■ On the facts of the case at bar, we do not reach the constitutional issue on which that trilogy of cases turned. The Commission found, and the record supports the findings, that Flynn accepted employment on the express understanding that he was not to discuss religion with patients or staff at St. Mary's Hospital; that the employer's request for avoidance of religious talk was a reasonable one in the circumstances; that Flynn nonetheless had such discussions; and that he was discharged

mission's decision. In its decision, the Superior Court recited both jurisdictional grounds and must be assumed to have disposed of all claims.

6. *See* n. 1 above. Plaintiff filed notice of a cross-appeal contesting the finding of statutory misconduct, but has not pursued it.

when he insisted that he would continue to talk about religion. The case at bar is not one where during the course of his employment the employee is forced by a change in policy by the employer to choose between violating the dictates of his faith and suffering unemployment. Nor can it be said that the claimant was confronted on the job with a different problem from any that Carrier's instructions prepared him to expect. Even if the claimant were viewed to have reacted reasonably by offering words of encouragement to some emotionally troubled patients in the emergency room, his religious speech went much further, even to the point of proselytizing in the cafeteria among hospital employees. Flynn knew from the start of his employment that such missionary work was proscribed.

Unlike the claimants in *Sherbert, Thomas,* and *Dotter,* Flynn took the security job at St. Mary's Hospital knowing that conduct he believed religiously compelled was forbidden by his employer. The Commission has not burdened his free exercise of religion, for he assumed the burden himself.

The entry must be:

Judgment reversed; case remanded to the Superior Court for entry of judgment affirming decision of the Maine Employment Security Commission.

ROBERTS, CARTER, VIOLETTE and WATHEN, JJ., concurring.

NICHOLS, Justice (dissenting).

I cannot join in the judgment announced this day.

Central to the controversy is the fundamental and twofold guarantee set forth in the First Amendment to the United States Constitution:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . . .

Through the operation of the Fourteenth Amendment the Free Exercise Clause applies to state action as well as to federal action. *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). The majority, however, elects to dispose of this appeal without reaching this constitutional issue.[1]

For the Founding Fathers, the word "religion" in the Free Exercise Clause may have had a fairly narrow meaning, reflecting the traditional theistic concepts prevalent in their time. The twentieth century, however, has brought manifold and dramatic changes to religion in America. The growing diversity in religious life and practice has appreciably broadened the range of human activity connoted by the term "religion" in the Free Exercise Clause. As we test this claimant's conduct by the freedoms guaranteed him by the First Amendment,[2] we must bear in mind that religious liberty protects more than the traditional forms of worship.[3]

The factual matrix out of which this controversy arose is a limited one. The Commission found that when Ambrose Flynn went to work for Camille Carrier he was told "it would be best" if he did not mention his past association with the Franciscan order. There is no evidence that he ever did so. The Commission further found that he was told "it would be best" if he minimized conversation on the job. There is nothing in the record to indicate that he participated in long conversations at the hospital.

While my colleagues premise their majority opinion on the ground Flynn "accepted

1. Neither does the majority address the Declaration of Rights in the Maine Constitution which proclaims, *inter alia*:

   [N]o one shall be hurt, molested or restrained in his person, liberty or estate for . . . his religious professions or sentiments, provided he does not disturb the public peace, nor obstruct others in their religious worship; . . . . Art. 1, § 3.

2. With a federally guaranteed constitutional right at issue, this is a federal question controlled by federal law. *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1246, 16 L.Ed.2d 314 (1966).

3. *See People v. Woody,* 61 Cal.2d 716, 727, 40 Cal.Rptr. 69, 394 P.2d 813 (1964).

employment on the express understanding that he was not to discuss religion," the Commission's findings of fact, on the contrary, indicate that it was "several weeks after he commenced work" before Flynn was called into Carrier's office and "instructed" not to discuss religion on the job. Further, according to Carrier the only reason for reprimanding his employee was "complaints" passed on to him about Flynn's conduct. These complaints were no more than "totem pole" hearsay. When at the hearing Carrier was asked five times who had made the complaints, he five times refused to disclose the sources.

The basic facts of this controversy, nevertheless, were clearly established, both by Flynn's admissions and by Carrier's statements; despite Carrier's request to Flynn not to talk with patients in the emergency room about anything, including his religious beliefs, Flynn refused to forego the imperatives of his religion. When in the presence of the emotionally distraught, Ambrose Flynn believed it his duty to God and to himself to speak. Even as for some a moment of silence or a brief period of meditation may at times be mandated by their religious faith, so for Ambrose Flynn, sitting in the emergency room with the psychotic or the suicidal, a vital element of his own religious life was not to keep silent but to express his own deep convictions.

For the refusal to keep silent at such crises Ambrose Flynn was discharged.

Discharge for such a refusal was deemed by the Superior Court, as well as by the Commission, to be "misconduct" within the

meaning of the Employment Security Law. 26 M.R.S.A. § 1043(23) (1974). The Superior Court concluded, however, that even if Flynn was guilty of statutory misconduct, the Free Exercise Clause prohibited the State from denying him the unemployment benefits to which he was otherwise entitled. On the contrary, this Court today concludes that Flynn took the job knowing that the conduct his religious beliefs compelled was conduct forbidden to him.

For today's majority, a citizen's deeply held religious convictions are as superficial a subject of conversation as yesterday's baseball scores—a subject freely censored at the whim of the employer. For them, free exercise is something which an employer can request an employee to waive on the penalty of disqualifying himself for the state's unemployment benefits.[4] For Ambrose Flynn, on the other hand, the expression of these religious views to people in great emotional distress was fundamental to his faith.

At the core of the Free Exercise Clause is voluntarism—the inviolability of conscience. As Professor Kauper has distilled the Clause, any attempt by government to punish a person for professing religious beliefs is a violation of his religious freedom. *Church and State: Cooperative Separatism*, 60 Mich.L.Rev. 1, 8 (1961). The Clause prohibits not only direct compulsion but also any indirect coercion which might result from subtle discrimination; it is offended by any burden based specifically on one's

---

4. The majority thereby adopts a waiver theory, reasoning that Flynn took the job with the understanding that he was not to discuss religion at the hospital. The Commission's findings of fact, however, do not adequately support a conclusion of waiver. The Commission found that when Flynn took the job, it was on an "it would be best" basis. Only later, after Flynn was on the job, came firm instructions from Carrier.

It is well established that courts closely scrutinize waivers of constitutional rights and "indulge every reasonable presumption against waiver." *Aetna Insurance Co. v. Kennedy*, 301 U.S. 389, 393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1937).

Moreover, in this First Amendment context, the evidence that rights were waived must be "clear and compelling." *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 145, 87 S.Ct. 1975, 1986, 18 L.Ed.2d 1094 (1967); *Sambo's Restaurants, Inc. v. City of Ann Arbor*, 663 F.2d 686, 690 (6th Cir. 1981).

This record falls far short of demonstrating that there can be attributed to Flynn "an intelligent relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

religion. L. Tribe, American Constitutional Law § 14.3 at 818 (1978).[5]

Today's majority imposes such a burden when it denies Flynn his unemployment benefits because he was true to his religious faith in talking as he did with the distraught. Moreover, that burden, the denial of unemployment benefits, is imposed with no compelling reason to warrant the intrusion upon Flynn's free exercise. *See Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965 (1963). The record before us does not demonstrate that the payment of unemployment benefits to Flynn would seriously threaten any state interest whatsoever, much less support a conclusion that there is "a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause." *Wisconsin v. Yoder*, 406 U.S. 205, 214, 92 S.Ct. 1526, 1532, 32 L.Ed.2d 15 (1972). It was the Commission's burden to show such a state interest, not Ambrose Flynn's burden to establish an absence of the same.[6]

Only a few months ago in *Dotter v. Maine Employment Security Commission*, Me., 435 A.2d 1368, 1372 (1981), we echoed the conclusion of the United States Supreme Court:

> [W]hen a state denies unemployment benefits because the worker has engaged in conduct mandated by religious belief, 'thereby putting substantial pressure on the adherent to modify his behavior and to violate his beliefs,' a substantial interference with the worker's free exercise of religion exists. *Thomas v. Review Board*, 450 U.S. 707 [101 S.Ct. 1425, 67 L.Ed.2d 624] (1981).

In *Sherbert v. Verner, supra*, the United States Supreme Court moved away from a position of strict neutrality and compelled another state to extend unemployment compensation benefits to claimants who refused to undertake work which would interfere with the observance of their Sabbath. Likewise, I submit, the State of Maine should not deny similar benefits to this claimant who was following the mandates of his religion when he talked with the distraught patients he encountered in the course of his employment.

In *Sherbert, supra*, the Supreme Court declared that more was required than a mere showing of a rational relationship to some state interest. Instead, the Court required a compelling state interest to justify the burden on free exercise noting that in this highly sensitive area "[o]nly the gravest abuses, endangering paramount interests, give occasion for permissible limitation." *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 322, 89 L.Ed. 430 (1945).

As I see it, today's majority violates the constitutional guarantee of free exercise.

The majority fails to apply the Supreme Court's balancing test—which, I suggest, the court below correctly invoked—and today enters a mandate which inhibits and burdens religion. Our Court instead should be safeguarding Ambrose Flynn's free exercise of religion. This is his fundamental constitutional right.

> Because it stands for the inner sanctuary of a man's life, religious freedom has its own unique equality and dimension. This is God's domain and Caesar may not trespass upon it.[7]

I would affirm the judgment of the Superior Court.

**5.** *See generally* Giannella, *Religious Liberty, Nonestablishment, and Doctrinal Development*, 80 Harvard L.Rev. 1381 (1967); Pfeffer, *The Supremacy of Free Exercise*, 61 Georgetown L.J. 1115 (1973); Note, *Time, Place and Manner Regulations of Expressive Activities in the Public Forum*, 61 Nebraska L.Rev. 167 (1982).

**6.** For a more recent application by the United States Supreme Court of the balancing test *see Johnson v. Robinson*, 415 U.S. 361, 375, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974).

**7.** P. Kauper, *Frontiers of Constitutional Liberty*, ch. III at 112 (1956).